No. 3492.    JUNE 12, 1923.

Description, and counsel's names, as in case next before.

---

## DAVIS *et al. v.* WARDE *et al.*

1. The general rule is that a stranger to a pending cause of action can not intervene therein, unless it is necessary for his protection that he be allowed to become a party defendant to the litigation, and thus afford him an opportunity to resist the rendition of a judgment which would operate to his prejudice.    But where an equitable cause of action is brought against certain defendants, praying injunction and other relief against them, and the latter answer averring that they are citizens and taxpayers affected by the result of the suit, and set up by way of cross-action matter of defense and pray affirmative relief against the plaintiffs, other defendants similarly situated may intervene and adopt the answer of the other defendants as their own, and be made parties defendant.

2. The act of the legislature of 1922 (Acts 1922, p. 457), which is an act to amend the charter of the City of Albany, and the acts amendatory thereof, so as to provide another form of municipal government known as the " commission city manager form of government," is not obnoxious to art. 3, sec. 7, par. 8, of the constitution of Georgia (Civil Code of 1910, § 6437), which provides that " No law or ordinance shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof."

   (*a*) Neither section 34 of the above-recited act nor the act as a whole is unconstitutional by reason of any objection urged against it.

3. Where the city charter of Albany provides for a board of canvassers, which has met and completed the count and declared the result of an election, such board of canvassers has exhausted its powers and can not subsequently meet and rescind their former order and recanvass the votes and reverse their prior decision and declare a different result.

4. Where, under the charter of the City of Albany (Acts 1922, p. 457), an election was held to determine whether the " commission city manager form of government " should be adopted or rejected, and the result of the election was declared by a board of canvassers provided by the charter, such declaration of the result of the election is prima facie correct; but where such election is attacked on the ground that the registration list, which was prepared and furnished the managers of the election, contained names of persons who were not authorized to register and to vote, a court of equity may hear evidence and determine whether such registration list contained names of persons who were not entitled to register and vote.

5. Under the 19th amendment to the constitution of the United States the right to vote shall not be denied or abridged by any State on account of sex.

(a) Prior to the act of the legislature of Georgia (Acts 1921, p. 38, sec. 2, par. 1) women were not required to pay a poll-tax of one dollar in this State.

(b) Under art. 2, sec. 1, par. 3, of the constitution of Georgia (Civil Code of 1910, § 6397), in order to entitle one to register and vote at any election by the people, such an one shall have resided in the State one year next preceding the election and in the county in which he offers to vote six months next preceding the election, and shall have paid all taxes which may have been required of such voter since the adoption of the constitution of Georgia of 1877 that he may have had an opportunity of paying agreeably to law. Such payment must have been made at least six months prior to the election at which he offers to vote, except when such elections are held within six months from the expiration of the time fixed by law for the payment of such taxes.

(c) The expiration of the time fixed by law for the payment of such taxes in this State is December 20 of each year.

(d) The female voters alleged to have been illegally registered in the present case did not have six months from the expiration of the time fixed by law for the payment of such taxes in the year 1922.

6. Under the facts of this case the court did not err in dissolving the restraining order and in granting the prayers of the cross-bill of the defendants.

### No. 3625. JUNE 7, 1923.

Petition for injunction. Before Judge Custer. Dougherty superior court. January 20, 1923.

The petition of John A. Davis and others alleges that they are citizens and taxpayers of the City of Albany, a municipal corporation, and they bring this suit on behalf of themselves and other citizens and taxpayers as may desire to be made parties thereto. They allege that the purpose of this suit is to enjoin the performance of certain threatened illegal and ultra-vires acts of the defendants named herein, to wit, G. G. Warde and others, and to prevent confusion and inconvenience and loss of funds, which would result to the City of Albany and the citizens and taxpayers thereof if the threatened acts are not prevented by injunction, and to prevent a misappropriation of the funds of the city to pay which the plaintiffs, and others in like situation, would be taxed. After alleging, by way of inducement, certain matters of controversy between certain factions within the City of Albany, it is alleged that on August 21, 1922, a bill was passed by the legislature (Acts 1922, p. 457) amending the charter of the City of Albany, changing the form of city government from what is known as the mayor and council plan to the commission city-manager form of government; that immediately after the passage of such bill there

were numerous protests against its passage, etc.; that under certain provisions of the commission city-manager form of government act, hereinafter called the commission act, a board of police commissioners, which had been elected for a term of two years, would be abolished and the chief of police and policemen would be elected by the city commission. Under the present charter of the City of Albany the chief of police is an officer elected for a period of two years, and the present chief was so elected in January, 1922. Under the commission act the chief of the fire department would become an employee to be elected by the new city commission, although under the terms of the present charter he is an officer of the city elected for a term of two years, and was so elected in January, 1922. Under this act a recorder is to be appointed and qualified and paid a salary of $50 per month, which is an expense to the taxpayers of the city not authorized by the present charter; also a new officer, to wit, a city manager, would have to be elected by the new city commission, at an expense to the taxpayers. The present board of education, which is an independent body having charge of the city schools, would be abolished if the act becomes operative, and a new board of education would be elected by the new city commission. There are many other provisions which would cause a dismissal of other employees and would change the present method under which the city government is operated; the effect of all of which, if there should be any doubt of which form of government is now legal, would throw the affairs of the city and the schools into hopeless confusion.

Pursuant to the terms of the commission act and school act there was held in the City of Albany, on December 4, 1922, an election for the purpose of determining whether either or both of said acts should be ratified by a vote of the people of the city, the election being held at an election for choice of councilmen of the city, next occurring after the passage of the act, and being held under the same rules and regulations and requirements of voters and registration as existed at the time of the passage of the acts for the holding of general city elections and for the certification and returns of the same, the polls being open for the registered qualified voters to vote on said issues on said date. The result of the election was certified to the mayor and council by the managers

of the election, as required by the city charter, and as so certified showed the following votes were cast for and against each of said propositions in said election, to wit: "For commission city-manager form of government" received 896 votes; "Against commission city-manager form of government" received 1173 votes; "For new school board" received 883 votes; "Against new school board" received 1200 votes. After the returns of the election were delivered by the managers to the clerk of council of the city, the mayor and council at their meeting after the election held on the 12th day of December, 1922, received said returns from the clerk of council, but did not at that time receive any certificate of the clerk of council, or any other official information showing what was the number of registered qualified voters appearing on the official registration list for said election. At the meeting of the mayor and council there was introduced, and voted upon, a resolution purporting to declare the results of the election, but the resolution was never legally adopted or spread upon the minutes of the meeting of the mayor and council, and never became operative, for the following reasons: (a) Because the mayor and council did not at that time have before them any official information or other information on which they could properly act, showing what was the number of registered qualified voters appearing on the official registration list for said election, so that the mayor and council could ascertain and declare whether or not a majority of the registered qualified voters appearing on the official registration list had voted against the adoption and ratification of said acts. (b) Because the resolution was never signed by the mayor and council of the city, or the officer presiding at the time the same was voted on, as is required by the charter of the city. (c) Because the purported resolution was never spread upon the minutes of the mayor and council as required by the charter of the city. (d) Because the mayor and council did not, at said meeting, fully perform their duties in declaring the results of said election as required by law.

At the next regular meeting of mayor and council held on January 2, 1923, and before reading and confirmation of the minutes of the former meeting of the mayor and council held on December 12, 1922, the matter of declaring the results of said election was again brought before the body; and their attention

having been called to the fact that the former purported resolution was ineffective, and that the duty of the mayor and council had never been fully performed with reference to declaring said result, the mayor and council then and there adopted a resolution declaring the former resolution ineffective, and rescinded and reconsidered and declared of no force or effect and ordered the former purported resolution not to be entered on the minutes of the mayor and council; and thereupon the mayor and council resumed the completion of the duties with reference to declaring the results of the election. At said time and place there was submitted to the mayor and council a certificate of the clerk of council, who is, under the terms of the charter of the city, the registering officer and registrar of the city and the official custodian of the official registration list of the city, in which said clerk of council then and there certified to the mayor and council the reasons why he had not theretofore furnished the mayor and council with official information as to the number of registered qualified voters appearing on the official registration list of the city for said election, and did certify the number thereof to the mayor and council under his hand and official seal, the number of said registered qualified voters appearing on said official registration list being then and there 2210, and being so certified by the clerk under his hand and official signature. Thereupon the mayor and council, in completion of their duties with reference to declaring the results of the election, did examine the returns of the election which had been received by them from the clerk, and in connection therewith did examine the certificate of the clerk showing the number of registered qualified voters appearing on the registration list, and, after examining fully into the matter, did pass a resolution declaring the results of the election and declaring that in the election a majority of the registered qualified voters appearing on the official registration list had voted " against commission city-manager form of government " and " against new school board," a copy of the resolution being attached to the petition. When the resolution was adopted the same was signed by the mayor of the city who presided at the meeting of the mayor and council and was countersigned by the clerk of council and was spread upon the minutes of mayor and council as required by the charter of the city. Neither the commission act nor the school act will become

operative on the second Monday in January, 1923, and the present provisions of the city charter providing for a mayor and council at large and five councilmen, and the present school board as now constituted, will remain of force on and after the second Monday in January, 1923, and the individuals composing the mayor and council and said old school board are the only ones who will have any legal authority to act on the matters within their respective jurisdiction on and after that date. Plaintiffs allege, that, even if said commission act had not been voted against by a majority of the registered qualified voters appearing on the official registration list at the election on December 4, 1922, the act could not become operative and could have no legal force and effect, for the following reasons:

A. The act is illegal and unconstitutional, because in violation of art. 3, sec. 7, par. 8, of the constitution of Georgia, which provides as follows: " No law or ordinance shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof." Said act violates the provision of the constitution in the following particulars: (1) The caption of the act indicates an intention " to provide for a referendum at the next election of city councilmen for the ratification of this act; to provide for qualification and registration of voters for the next election of councilmen," whereas the body of the act in section 34 thereof, providing qualifications for the voters in said referendum section, makes provision that not only those who might register in 1922 should be eligible to vote as then and now provided by law, but likewise all who were registered and qualified to vote in the previous election in 1921 should be counted as registered qualified voters in said 1922 election; there being nothing in the title of the act to indicate that those who were qualified in 1921 to vote in said 1921 election would be made eligible to vote in the 1922 election. (2) The title of the act expresses an intention " to provide for a referendum at the next election of said council for the ratification of this act," thereby expressing that it is the purpose of the act to provide for what is generally and commonly known as a referendum, to wit, a referring of the ratification or non-ratification of the act to the qualified voters of the city voting at an election on that question; whereas the so-called referendum provided in the body of the act

48

is entirely different from the one thus expressed in the title of the act, the body of the act providing, in lieu of a real referendum, that the act shall become operative unless the same is voted against by a majority of the "registered qualified voters appearing on the official registration list for said election," thereby attempting to make the ratification or non-ratification of the act depend upon, not how a majority of those voting in said election should vote, but rather upon how many of the qualified voters whose names appear on the official registration list for said election who (by reason of freedom from illness or other preventing causes) were able to come out to said election and cast their ballots against the ratification of said act, the purpose and effect of said provision being that the author thereof by said provision alone virtually cast and counted "for ratification" of said act the vote of every qualified voter whose name appears on said registration list, and who, by reason of sickness or other causes, did not go out to said election and actually cast a ballot, making the referendum in the body of the act so unreasonable and arbitrary that it will be void. (3) Said body of the act also provides that said act shall be deemed ratified and go into effect without any election or referendum if the mayor and council should refuse or fail to hold said election, thereby leaving the question as to whether there should be a referendum on said act entirely to the whim or option of the mayor and council of the city, which is directly contrary to what is expressed in the title of the act, viz., that there shall be provided an unconditional, fixed and certain referendum for the ratification of the act, regardless of what may be the whims or option of the mayor and council of the city. (4) The title to the act expresses an intention "to provide for a referendum at the next election of city councilmen for the ratification of this act; to provide for qualifications and registration of voters for next election of councilmen;" whereas the body of the act in section 34 thereof provides that, "in the voting on the ratification of this act as herein provided, those who were registered and qualified voters in the city election of 1921 for the choice of mayor and council shall be deemed registered and qualified voters for said election in 1922, unless disqualified by residence requirements, or failure to pay required taxes under the law, and shall not be required to register again in order to vote in said election;" and "the

provision set out herein in this section for the registration and qualification of voters for the next election of councilmen in Albany in 1922, in which election the referendum herein provided is to be voted on, shall take effect from and after the passage of this act;" and the last-quoted provision in the body of the act seeks to make effective and operative immediately and before the ratification of the act that portion of it above quoted; and in so far as the provision in the body of the act seeks to make that portion of it effective and operative immediately and before the ratification of the act, the same is matter different from what is expressed in the title of the act, in that (a) the title of the act expresses the purpose to "provide a referendum . . for the ratification of this act," viz., the whole of the act and not a part thereof, and hereby expresses the purpose that the act as a whole, and not merely a part thereof, shall become effective and operative only upon ratification of the same in said referendum, and therefore said portion of the act, seeking to make a part thereof effective and operative immediately and before the ratification thereof, is matter different from what is expressed in the title; and (b) that portion of the title of said act, expressing the purpose "to provide for qualifications and registration of voters for the next election of councilmen," could not authorize the insertion in the body of the act of the provision (which could be immediately effective and before the ratification of the act) purporting to provide who should be deemed registered qualified voters authorized to vote in said election as to who should be councilmen, and this is true because even said portion of the title of the act which expresses a purpose "to provide for qualifications and registration of voters for the next election of councilmen" expresses a purpose to provide who should be deemed registered qualified voters authorized to vote in the election on the question as to who shall be councilmen alone, and not who shall be deemed authorized to vote in said election on the question of ratifying said act; and therefore, and for this reason, the provision in the body of the act purporting to provide who shall be deemed registered qualified voters authorized to vote in the election on the question of ratifying the act is matter different from what is expressed in the title thereof. (5) Plaintiffs allege that inasmuch as the words of the title of the act quoted above express clearly that there shall be "a referendum . . for

the ratification of " said act, and thereby express with clearness in the title of the act that the operation of the act shall be dependent upon the ratification thereof in the referendum, and that the act shall not be operative unless and until it shall be ratified in said referendum, and inasmuch as the so-called referendum provided in the body of the act, that if the mayor and council shall refuse or fail to hold the election then said act ·" shall be deemed ratified and go into effect," is unconstitutional and void for the reasons set out above, it follows that the portions of the act purporting to make the same become operative or of force either under the so-called referendum, or without a referendum or election, are unconstitutional and void as violative of the section of the constitution above quoted, and that the act as a whole is unconstitutional and void as violative of said section of the constitution.

B. The act of 1922 attempts to lay down a qualification of voters in the election to be held for the purpose of determining whether the acts shall become law, and the qualifications prescribed by the act being in conflict with art. 2, sec. 1, pars. 2 and 3, and also with art. 2, sec. 2, par. 1, of the constitution of Georgia, said paragraphs being embodied in §§ 6396, 6397, and 6404 of the Code of 1910, because the act does not disqualify, but purports to allow to vote in said election all those who shall have been convicted in any court of competent jurisdiction of treason against the State, or embezzlement of public funds, malfeasance in office, bribery, or larceny, or of any crime involving moral turpitude, punishable by the laws of this State with imprisonment in the penitentiary, without such persons having been pardoned, and also idiots and insane persons, the qualification provided for in said act being void; and there being no other provision to determine the qualifications of the voters in said election, the qualification of each voter becomes a question of fact and the same is controlled by the circumstances in each case.

C. The act, and especially that portion thereof which purports to provide that " in voting on the ratification of this act those who were registered and qualified voters in the city election in 1921 for choice of mayor and councilmen shall be deemed registered and qualified voters in said election of 1922, unless disqualified by residence requirements or failure to pay required taxes under the law, and shall not be required to register again in order to vote

in said election," is unconstitutional and void, in that (1) it violates art. 2, sec. 1, par. 1, of the constitution of Georgia, now embodied in Code § 6395, which allows to vote only those persons "who have been first registered in accordance with the requirements of law," in that said provision purports to allow to vote in said election certain persons arbitrarily selected and described in said provision as having been registered and qualified voters in the city election held long before the passage of said act and while said act was not in existence, and who therefore were not, so far as any election which could be held under said act was concerned, "first registered in accordance with the requirements of law;" and (2) also violates art. 2, sec. 2, par. 1, of the constitution of Georgia, now embodied in Code § 6404, which provides that certain classes of persons therein named "shall not be permitted to . . vote," in that said provision purports to allow to vote in said election and to be counted as a voter, even though he should not vote in said election on the question of ratifying said act, all persons who "were registered and qualified voters in the city. election of 1921 for the choice of mayor and council, . . unless disqualified by residence requirements or failure to pay required taxes under the law," this regardless of how many of such persons may have, since the election of 1921, been convicted, in any court of competent jurisdiction, of treason against the State, of embezzlement of public funds, malfeasance in office, bribery, or larceny, or of any crime involving moral turpitude, punishable by the laws of this State with imprisonment in the penitentiary, or without such persons having been pardoned, and regardless of whether they have been pardoned, and also all who have become idiots or insane persons, and thus said provision of said act seeks to override the constitution of said State, and to name as qualified voters in said election persons who were not qualified to vote in any election in Georgia, and for this reason said provision for said election is void; and inasmuch as the title of said act expresses that there shall be a, referendum for the ratification of said act, and thereby expresses that said act shall not be operative unless there is a valid ratification thereof in a valid referendum, it follows that that part of said act which purports to make said act become operative is void as being matter different from what is expressed in the title of said act, in violation of said art. 7, sec. 7, par. 8, of the constitution of Georgia.

The school bill, or board of education act, hereinbefore referred to, seeking to legislate out of office the present board of education of said city, and to legislate into office a new board of education (Acts 1922, p. 454), is, as to title and provisions for referendum similar to the commission act, and is subject to substantially the same attacks, and the plaintiffs make the same attack with reference to it as are made herein with reference to the commission act, and allege that the same is inoperative for the same reasons. Those constituting a majority of what would be the city commission under the commission act, if the same were operative, are threatening and preparing to go forward and act under the commission act and to take over the entire charge of all the affairs administrative and governmental in the city, under the terms of the commission act, and are threatening and preparing to choose a city manager for the operation of the affairs of the city, and to exclude from the performance of their duties under the charter of the city both the mayor of the city and the councilman at large, and the board of police commissioners and the water and light commissioners, and also the board of education of the city as it is now constituted; and they will do so unless restrained by the court; and the result thereof will be that the handling of the affairs of the city by and through its mayor and council and other officers above mentioned, who are the duly qualified and proper officers for the management thereof, will be interfered with and rendered nugatory, and there will be irreparable confusion in the business affairs of the city, and loss and damage will thereby result to the city and to plaintiffs and other taxpayers thereof, and if all of the matters are not determined and settled in this procedure a multiplicity of suits and litigation with and by the city and its various officers and taxpayers will ensue, and in addition the disputes and confusion as to which of the officers would be in authority and have the right to control the property and funds of the city and disburse such funds will cause endless confusion and loss and damage to the municipality and the taxpayers thereof; and unless the respective rights of the parties as to the control of the property and funds of the city be promptly determined in this suit, the business affairs of the city will be thrown into a chaotic condition and the city can not properly function as a municipal corporation.

Wherefore the plaintiffs bring this petition and pray that the defendants and their successors be enjoined from taking any oath of office or otherwise qualifying, organizing, or acting as a commission of the City of Albany, or in any other capacity under the commission act, and from carrying out in any way any of the terms of the commission act, or interfering in any way with the mayor and council of the city in the discharge of their duties as mayor and councilmen under the charter and laws of the city, or doing any act of any kind that would interfere in any way with the orderly administration of the business and governmental affairs of the city as the same should be administered by the mayor and council of the city, or from in any way interfering with or attempting to interfere with the moneys or property of the city by appropriating the same or attempting to do so in any way under the terms of the commission act. They pray also that the defendants be enjoined from electing or choosing members of the board of education of the City of Albany under the new school act, or in any way attempting to do so, etc.; that the defendants be enjoined from yielding their positions or offices as mayor and councilmen respectively to any commissioners under the commission act, and be enjoined from ceasing to perform their duties as mayor and council respectively under the present charter of the City of Albany, under which their offices were created, so that they may continue to act as mayor and council disregarding the commission act.

Three of the defendants, Warde, Rawson, and Legg, filed their answer to the petition, admitting some of the allegations thereof and denying others, and averring specifically that the purpose of the petition is not as alleged by the plaintiffs, but is for the purpose of trying to retain political advantages for those against the city-manager form of government, which advantages they are not entitled to under the will of the majority of the white citizens of Albany; and then the answer proceeds to set forth what is termed " a short history of the facts leading up to the filing of the equitable petition by the plaintiffs in this case." The answer sets out the substance of the act of 1922, and avers that certain candidates in the fall election of 1922, who were favorable to the city-manager commission form of government, were elected. It is also averred that a majority of the councilmen under the present city government opposed to the commission act passed an ordinance on

September 14, 1922, providing for a board of registrars to make up a registration list to be furnished the managers on the day of the election. The commission act provided that the qualified voters for said election would be all those qualified to vote and shown on the registration list for 1921, and also all other persons who might register legally during the year 1922. The board of registrars, who are all hostile to the bills, met and purged the registration list and certified to it as being the correct list to be used on election day on which the commission act was to be voted on. The list as certified by the board of registrars contained 2795 names. So well did this board of registrars, consisting of citizens of Albany, perform its duty that the mayor and council passed a resolution thanking them for their excellent service and voting to them the sum of $450 in payment for their services. The registrars delivered the registration list to the city clerk, who retained it until the morning of December 4, 1922, the day on which the question of the ratification of the acts of the legislature was to be voted on. The clerk delivered, on the morning of the election, the registration list to the managers of the three voting precincts in Albany as being the correct list of voters who were entitled to vote on that date. Those opposing and those favoring the commission act made an effort to vote every person possible shown on the registration list, each considering it the official list, as the city clerk and the board of registrars had both considered it the official list. The commission act provided that those in favor of the act and those opposing it should both be entitled to have representatives at the various precincts on the day of the election, and each side was entitled to have representation amongst the clerks and managers of the election precincts. The mayor and council, all of whom were unfavorable to the commission act, except one, promised the friends of the act, both orally and in writing, that they would be given representation at the various voting precincts. Nevertheless the mayor, acting for himself and city council, refused on the morning of the election to give those favorable to the commission act representation at the court-house precinct, where more than 900 votes were cast. He did agree to appoint only one person favorable to the commission act at the court-house precinct, but the person was denied that privilege arbitrarily by the mayor, who permitted the election to continue for more than twenty

minutes with but two managers and three clerks, all of whom were opposed to the commission act, and finally selected a third manager who was also opposed to the act. At the court-house precinct the second and third ward voters voted in different boxes. The third ward voted a total of 296 votes, but the clerks and managers reported that only 245 persons voted, thus failing to account for 51 votes.

After the election was over, despite the irregularities mentioned and despite the fact that more than 100 negroes voted against the commission act, the official returns of the managers showed that the act had not been defeated, as a majority of the voters had not voted against it. The mayor and council thereafter met on December 12, 1922, and accepted the registration list which the board of registrars and the clerk of the city had certified as the correct list for the holding of the election, and the mayor and council then and there declared that the commission act and the school-board bill had been ratified and would become operative on the second Monday in January, 1923. Two of said councilmen made statements to two of these defendants that they had thus officially acted, and that the bills were ratified. The mayor and council, being dissatisfied with their defeat, later met, on January 2, 1923, and declared that their own ordinance of September 14, 1922, creating the board of registrars, was illegal, as the charter of 1917 provided that the city clerk was the sole judge of the qualification of voters. These defendants aver that when the clerk accepted the registration list as certified by the registrars and personally delivered it to the election managers, he thereby ratified the list as being the correct registration list, whether he actually verified it in writing or not, as the city charter did not require him to certify to the list in writing. On January 2, 1923, the mayor and council again met and declared their former action of December 12, 1922, illegal on the ground that an illegal registration list had been submitted, and that the clerk of council, in making his return of the election to them on December 12, 1922, had misinformed them by showing that there were 2795 names on the registration list. In the meantime the clerk, acting under order of the mayor and council, had gone over the registration list and had declared, without giving any one favorable to the commission act an opportunity to be heard, that there were only

2210 persons on the registration list qualified to vote. The mayor and council acted on the list thus certified to them by the clerk, and rescinded their former action of declaring the bills ratified, and declared them defeated, as they claim that at the election of December 4, 1922, 1173 voted against the bill. It is averred on information and belief that if it had not been for the irregularities in the election, as herein set forth, the official returns of the election would have shown that a majority of the people voting actually voted for said bill. The city charter of 1917 provides that " the mayor and council shall, at their first meeting after the election, receive such returns from the clerk of council and declare the result of the election in accordance with the certificate of the managers, . . the question voted upon being declared carried or not carried, as the case may be, which certificate, together with the resolution of the council declaring the result of the election, shall be entered on the minutes of the council." For this reason it is averred that, after the result of the election had been declared on December 12, 1922, there is no law authorizing the clerk to prepare and certify a new list of voters different from that actually used on the day of the election, and that there is no law permitting the mayor and council to recognize a new list and thus rescind the first act of declaring the bill ratified, and their attempt to do so is null and void, etc.

It is averred that those purporting to hold office are doing so without authority, as there are no offices to hold. Those persons claiming to act as mayor and councilmen are not de facto officers, as there are no offices to hold under the old charter of 1917, and there can be no de facto office. Under the charter of 1917 councilmen are elected to hold office until their successors are qualified, and the charter of 1917 has been superseded by the act of 1922; and therefore there can be no successors to said councilmen. It is not a question of one officer succeeding another; it is now a question of one government succeeding another. The former mayor and council have no authority over the affairs of the city, as their resolution of December 12, 1922, passed by them at their first regular meeting after the election, is true, and the bills have been ratified. If their statements made at the meeting in the resolution are true, they are by their own admission no longer mayor and councilmen of Albany. Mr. H. A. Peacock, as mayor

of Albany, admitted to the Governor of Georgia that this commission act had been ratified. Immediately after the election of December 4 the mayor went to Atlanta; and it is on information and belief alleged that he told the Governor that the city-manager commission form of government in Albany had been ratified, that the act creating the form of government provided for the office of recorder, and that said Peacock wanted the office of recorder and was making application for the same. Defendants aver, on information and belief, that the Governor, acting on the statement of the mayor, did appoint him as recorder under the act creating the commission form of government in Albany, and issued to him a commission, and the commissioned office was accepted by him. For these reasons plaintiffs are estopped from attempting to set aside this new form of government, claiming that the acts of the mayor and council in declaring the bill ratified were not a sufficient ratification. The bills have been ratified and are now operative; and these defendants ask the court to dissolve its restraining order, that peace and security may be maintained in the city under a legal form of government, etc.

The City of Albany also answered, admitting some of the paragraphs of the petition and denying others. Answering specifically paragraphs 15 and 16 of the petition, this defendant avers that the resolution referred to in paragraph 15 was, as alleged, introduced and voted upon, but thereafter on January 2, 1923, in regular meeting assembled, the mayor and council, after official investigation, found and determined that as a matter of fact the registration. list of 1921 and 1922 showed ·2210 persons qualified under the commission and school acts to vote in the election, instead of 2795 persons as erroneously assumed in the resolution, and that therefore the election was not in favor of said bills (a majority of the voters having voted against their ratification) and should not have been so declared. For this reason, and for substantially the reasons set out in paragraph 15, and while the same were still in the breast of the mayor and council, and before the time had arrived for the acts to become operative, and being the particular mayor and council charged with the duty of properly declaring the results of said election, they rescinded the resolution and declared the results of the election with reference to said bills and in accordance with the facts of the case.

This defendant has been advised through its city attorney that neither the commission act nor the school act could become operative under the facts and law of the case, as they existed on the second Monday in January, 1923.

The defendants prayed that the persons acting as mayor and council be restrained and enjoined from undertaking to act as officers of the municipality known as the City of Albany; that the persons claiming to act as mayor and council and each of them be held to be trespassers in said offices; that it be held that the charter of the City of Albany of 1917 is at an end; that the charter of 1922 is in effect; that the commissioners herein set out are the due and legal authorities in charge of the administration of the City of Albany under its charter of 1923; that the persons claiming to act as mayor and council be restrained from interfering with the administration of the commissioners and of the government to be organized by them; that the restraining order heretofore granted be dismissed. There was also a prayer for general relief.

By leave of the court H. S. Harper and others, intervening as defendants, filed their separate answer to the petition, averring that they are all taxpayers and citizens of the City of Albany and vitally interested in the matters of controversy; and adopted as their own all the answer and pleadings filed herein by the defendants G. G. Warde and others. They also specifically aver that the entire election proceedings by which it has been sought to defeat the commission form of government bill in Albany in the election of December 4, 1922, have been so irregular and tainted with fraud and illegality as to constitute a flagrant disregard of law and of the political rights of the citizens of Albany; specific details of which are set out in the answer.

After hearing the case the trial judge ordered that the restraining order granted on January 6, 1923, be dissolved, and that the prayers of the cross-bills of the defendants Warde and others be granted, and that the mayor and council of the City of Albany be restrained from undertaking to act as officers of the City of Albany and be restrained from interfering with the administration of the commissioners and with their taking office as such commissioners and organizing the city-manager commission form of government and proceeding under the school act.

" This order is to become effective upon the plaintiffs failing to present a bill of exceptions within ten days from the date of this order. Upon their presenting a bill of exceptions within ten days from the date of this, the said bill of exceptions shall operate as a supersedeas." To this judgment the plaintiffs excepted.

*Pottle & Hofmayer, Milner & Farkas,* and *Pope & Bennet,* for plaintiffs.

*Alston, Alston, Foster & Moise; R. H. Ferrell, D. H. Redfearn, H. A. Peacock,* and *J. T. Mann,* for defendants.

HILL, J. (After stating the foregoing facts.)

1. The defendants in the original proceedings having been served or acknowledged service and having filed answers to the petition, except A. E. McLean, all parties announced ready for trial on the issues raised by the pleadings on the hearing before the judge for injunction. At this stage of the proceedings there was presented to the trial judge an application by H. S. Harper and others, alleging that they are all taxpayers and citizens of the City of Albany and vitally interested in the matters in controversy in this case. It was averred that they adopted as their own all the answer and pleadings filed by the defendants, G. G. Warde, C. W. Rawson, and W. M. Legg; and then they answered specifically along substantially the same line as the other defendants. They prayed for leave to intervene and be made parties defendant. The plaintiffs objected to the granting of the application to intervene and to the allowance of the intervention, and especially each part of the application, following the second paragraph, upon the grounds that the intervention sets out no facts relevant to any relief sought by the plaintiffs; that the intervention sets out no facts relevant to any cause of action involved in the plaintiffs' petition, or any defense involved in the defendants' answer, and that the intervention shows no cause or right to intervene. Conceding, but not deciding, that all of the petition for intervention after the second paragraph sets out no facts relevant to any relief sought by the defendants, as contended by the plaintiffs, we are of the opinion that when the intervenors adopted as their own all the answer and the pleadings filed by the defendants, the substance of which is set out in the foregoing statement of facts, the answer of the defendants, which was adopted, did set out facts relevant to the relief sought by them; and therefore the trial court did not

err in allowing the intervention filed by the defendant intervenors. But it is argued by the plaintiffs that there is no statute in Georgia allowing such an intervention (as there is in cases of validation of bonds and the like) ; and that, in the absence of a statute allowing an intervention, intervenors are allowed to be made parties over the objection of the plaintiffs in two cases only : first, in a proceeding in rem, or quasi in rem, where a fund or property against which the intervenor has some right is in the custody of the court; or, second, in a case where the beneficiary of a trust is allowed to intervene because his trustee is unfaithful to the trust, or in representing the property; and in support of this proposition the plaintiffs in error cite three cases from jurisdictions other than our own, viz.: Curtis *v.* Curtis (Ala.), 60 So. 167 ; ex parte Printup, 6 So. 418 ; Ehrenstrom *v.* Phillips (Del.), 77 Atl. 80. It is argued that in all other cases than the ones pointed out above the plaintiff is dominus litis, and others who wish to assert their own alleged rights must file their own bill and can not intervene as defendants in a case like the present. A number of cases are cited, beginning with Shields *v.* Barrow, 17 How. 130 (15 L. ed. 158). It is further argued that the plaintiff must consent to an outsider coming into the suit, except in the two cases mentioned, citing Drake *v.* Goodridge, 7 Fed. Cas. 4062, 6 Blatch. 151; Steele *v.* Taylor, 1 Minn. 274 ; Sheppard *v.* N. J. Cons. etc. Co., 73 N. J. Eq. 578 (74 Atl. 140) ; Stretch *v.* Stretch, 2 Tenn. Ch. 140. And see Whiting *v.* Hanover National Bank, 23 L. R. A. 531 (1).

It is insisted that our own courts have recognized the rule that a person has no right to intervene with the defendant in equity against the complainant; and the case of *Armour Car Lines* v. *Summerour, 5 Ga. App.* 619 (63 S. E. 667), is cited in support of the proposition. In the *Armour* case the Court of Appeals said: " In a suit in rem all persons who have interest in the res should be allowed to intervene and be heard in behalf of their interests in it. Every such person has a legal interest in the controversy, because of his interest in the res. In a suit in personam, however, a petition to intervene, presented by one who is not a party thereto and who has no interest, in a legal sense, in the subject-matter of the suit, should be refused, especially where the applicant, of his own motion, seeks to be made a party defendant, and the plain-

tiff in the case objects thereto. The right of a defendant to vouch into court another who is liable over to him, which is conferred by the Civil Code, § 5234, does not include the right of volunteering to become a defendant, when no notice has been given by the defendant, and when the plaintiff has not asked such an one to be made a party defendant." And the case of *Clark v. Wheatley*, 113 *Ga.* 1074 (39 S. E. 437), is also cited, where this court held that " It is not the right of a stranger in a pending cause to intervene therein, unless it is necessary to his protection that he be allowed to become a party to the litigation and thus afford him an opportunity to resist the rendition of a judgment which would operate to his prejudice." The case of *Wilson v. Green*, 141 *Ga.* 790, 791 (82 S. E. 241), is also cited, where this court held : " The court erred in admitting in evidence the two deeds above referred to, which had not been recorded nor the execution thereof proved. 2. While the rule as to the admissibility of evidence on interlocutory hearings has been held not to be in all particulars as strict as on jury trials, and while parol evidence is admissible to apply certain written statements to their subject-matter, the statements in the affidavits above referred to were not admissible in evidence under either of the rules just stated. 3. The errors pointed out were material and went to the very heart of the contention between the parties; and this court can not with any certainty know what would have been the decision of the judge had such illegal evidence been excluded. It is not intended to indicate that a temporary injunction should be granted; but the judgment refusing such an injunction is reversed, with direction that another hearing may be had in view of the rulings here made." The argument with reference to the last-cited case is that the allowance of the intervention is analogous to the erroneous allowance of an amendment, or the erroneous overruling of a demurrer, and that it necessarily affected the whole of the remainder of the trial and should result in the reversal of the case, or sending it back for a trial with the intervention stricken. But we do not assent to the view of learned counsel for the plaintiffs. We think that the intervention was properly allowed, and that the effect of its allowance could not have had the consequences as pointed out by them. With reference to the first two Georgia cases cited, regardless of what rule has been adopted by outside jurisdictions,

we are of the opinion that the Georgia cases lay down the correct rule, and that they are not applicable to the case under consideration. Those cases state the rule to be that in a suit in personam a petition to intervene presented by one who is not a party thereto and *who has no interest* in the subject-matter of the suit should be refused. But in the instant case the defendants who have intervened have identically the same interest as the original defendants had. They are citizens and taxpayers of the City of Albany, and they have the same interest in the form of municipal government under which they shall live as the original defendants had; and that being so, we can see no good reason why they should not come in by way of intervention and join with the other defendants in making whatever defense the original defendants may have to the injunction proceedings brought against them, which is common to both. In such case it can not be said that the defendant intervenors have no right to intervene, and that they have no interest in the subject-matter of the suit.

2. The act of August 18, 1917 (Acts 1917, p. 454), created and established a new charter for the City of Albany, providing for a municipal government of the city under what is known as the mayor and council plan. The act of 1922 (Acts 1922, p. 457) was an act which undertook to amend the charter of the City of Albany and the acts amendatory thereof, and to provide another form of municipal government known as the commission city-manager form of government. The act of 1922, supra, has a caption covering almost two pages in the printed acts of the Georgia Laws for 1922. The caption in part is as follows: " An act to amend the present charter of the City of Albany and acts amendatory thereof; to provide for the election of five commissioners from each of the five political wards of the City of Albany, in lieu of the present mayor and council; to provide for certain councilmen to become commissioners; to provide the manner of election of commissioners, to fix their qualifications, compensation, term of office, powers and duties; to provide for the choosing of a city manager by the said commissioners, and to fix his qualifications, compensation, powers, duties, and term of office; . . to provide for a referendum at the next election of city councilmen for the ratification of this act; to provide for qualifications and registration of voters for the next election of councilmen, and for other purposes."

It would be unprofitable to set out the caption of this act in full. The act of 1922, supra, is attacked by the plaintiffs as being illegal and unconstitutional as in violation of art. 3, sec. 7, par. 8, of the constitution of Georgia (Civil Code of 1910, § 6437), which provides that " No law or ordinance shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof." We have set out at very considerable length in the statement of facts the various contentions of the plaintiffs as to why the body of the act contains matter different from what is expressed in the title thereof; and it will be unnecessary to repeat them here. We may, however, repeat succinctly some of these contentions for the purpose of consideration of the question involved. One contention made by learned counsel is that the caption provides for a referendum at the next city election for the ratification of the act of 1922, and that in the body of the act it is provided that it shall become the law and the new charter for the City of Albany " unless a majority of the registered qualified voters appearing on the official registration list for said election shall vote ' against commission city manager form of government.' " Another contention is that the caption shows an intention to provide for the qualifications and registration of voters in the election, while the body of the act provides that not only those who might register under the act should be eligible to vote, but also all who had registered in the previous election and not before, and that there is nothing in the title to show that those who had registered and not before would be made eligible to vote in the said referendum, etc., as set out in the statement of facts. The question to be determined, therefore, is whether there is a difference between the subject-matter contained in the body of the act and the title of the act.

The purpose of the constitutional provision quoted above is to put the public on notice as to what legislation is sought to be enacted, in order that the public, if interested in the subject-matter of the legislation could be heard in proper ways before the proposed legislation is enacted into law. Obviously, a caption can not contain as much of the subject-matter as is contained in the body of the act; else there would be no need of the caption at all, which is intended merely to put the public on notice and inquiry, as already indicated, as to the class or kind of legislation proposed

to be enacted. We are of the opinion that the fact that the caption of the act provides for a referendum covers any form of referendum, and puts the public on notice that the act deals with a referendum, and if the public is interested enough it can ascertain what the body of the act contains with reference to such referendum. This court has repeatedly held that the slightest mention in the caption of an act is sufficient to cover that subject, whatever it may be, in the body of the act; and the fact that the body of the act provides for an unusual method of referendum would not be sufficient for us to hold that the body of the act was not covered by the title thereof. The subject to be considered is a referendum, regardless of the kind of referendum provided; and where the caption of the act calls attention to the fact of a referendum, this is sufficient to put the public on notice that some form of referendum will be adopted. What we hold is that a reference in the caption to the fact of a referendum is sufficient to put the public on notice that some kind of a referendum would be considered and probably enacted into law.

It is also insisted that under the provisions of the act, if no referendum election was had by a certain date, the act should become operative and of force, and that there is nothing in the caption of the act to put the plaintiffs and the public on notice of that fact. This court has held that it will not hold an act of the legislature unconstitutional on a question raised by one who has not been injured by reason of that fact, and it is not insisted here that the act did go into effect without a referendum vote. The legislature, of course, would have the right to pass a bill without having it submitted to a vote of the people; but that question is not involved in the present case, because there was a referendum vote.

It is insisted that the title shows an intention to provide for the qualification and registration of voters, while the body of the act provides not only who might register under the act and should be eligible to vote, but also all those who had registered in a previous election, and not before, there being nothing in the title to show that those who had registered, and not before, would be made eligible to vote in the referendum. We are likewise of the opinion, on this ground of the assignment of error, that the caption of the act was sufficiently broad to call attention to the subject-matter of providing for qualification and registration of voters for

the next election of councilmen, and for other purposes, and this was sufficient to put upon inquiry any citizen who was interested in that subject-matter, and we can not say that the matter embraced in the body of the act which is attacked as being illegally therein is foreign to the general purpose and scope of the legislation indicated by the language of the caption to the act. In their brief counsel for plaintiffs say that it may be conceded that if the caption to the act was merely to amend the charter of the City of Albany, and for other purposes, and had stopped there, there might have been inserted in the body of the act a provision for almost any sort of referendum, or a provision that the act should become operative at the whim of the mayor and council or of the grand jury, or others, but such a title would have put the public on notice that anything germane to the charter of the city might be included in the body of the act, and that it would have been the duty of the public to read all of the act, if necessary, to find out what provisions it contained. If a caption to an act which merely recites the fact of the purpose to amend a city charter is sufficient in order to include anything that is germane to such purpose, we are unable to see why a caption entitled " an act to amend the present charter of the City of Albany," etc, and containing in addition language as broad and comprehensive as the present one does, is not sufficient to put the public on notice of everything that is contained in the act which is objected to here as being obnoxious to the provision of the constitution set out in the beginning of this division of the opinion.

In *Welborne* v. *State,* 114 *Ga.* 793 (40 S. E. 857), this court held that " The title to an act need not contain a synopsis of all of its provisions. Any legislation which is germane to the general purpose of the act as indicated in the title can be properly embraced in the act, and, no matter what may be its details, the legislation embraced therein will not render the act subject to the objection that it contains matter variant from the title, so long as such matter is legitimately within the general scope of the purpose of the act as indicated in the title." And see, to the same effect, *Brand* v. *Lawrenceville,* 104 *Ga.* 486 (30 S. E. 954) ; *Hope* v. *Gainesville,* 72 *Ga.* 246 ; *Carroll* v. *Wright,* 131 *Ga.* 728 (63 S. E. 260) ; *Mayor &c. of Savannah* v. *State,* 4 *Ga.* 26 ; *Smith* v. *Bohler,* 72 *Ga.* 546 ; *Brown* v. *State,* 73 *Ga.* 38 ; *Howell* v. *State,* 71 *Ga.*

224 (51 Am. R. 259) ; *City of Atlanta* v. *Gate City Street R. Co.,*
80 *Ga.* 276 (4 S. E. 269) ; *Alberson* v. *Hamilton,* 82 *Ga.* 30 (8 S.
E. 869) ; *Dallis* v. *Griffin,* 117 *Ga.* 408 (43 S. E. 758) ; *Town of
Poulan* v. *Atlantic Coast Line R.· Co.,* 123 *Ga.* 605 (51 S. E.
657) ; *Newman* v. *State,* 101 *Ga.* 524 (28 S. E. 1005) ; *Cunning-
ham* v. *Griffin,* 107 *Ga.* 690 (33 S. E. 664) ; *Mayor* v. *Hughes,*
110 *Ga.* 795 (36 S. E. 247) ; *Richardson* v. *Macon,* 132 *Ga.* 122
(63 S. E. 790) ; *Butner* v. *Boifeuillet,* 100 *Ga.* 743 (28 S. E. 464).

The plaintiffs cite the following cases in support of their con-
tention that the act of 1922 is unconstitutional and void, because
the body of the act contains matter different from that contained
in the caption thereof. The first case cited is that of *Blair* v.
*State,* 90 *Ga.* 326, 329, 330 (17 S. E. 96, 35 Am. St. R. 206). The
last sentence of the quotation from that case is as follows: " The
constitution intended to protect people against covert or suprise
legislation;" and that we take it is the true rule, but we fail to
see in this case how there could be, under the caption of the act in
this case, a failure to put the public on notice of the general scope
of the legislation proposed. The following cases are also cited:
*National Bank of Augusta* v. *Southern Co.,* 55 *Ga.* 36, 38, near
bottom; *Tolbert* v. *Long,* 134 *Ga.* 298 (1), 300 (67 S. E. 828) ;
*Bass* v. *Lawrence,* 124 *Ga.*·75 (2) (52 S. E. 296) ; *Board of Edu-
cation* v. *Barlow,* 49 *Ga.* 232 (4), 241; *Conley* v. *State,* 85 *Ga.*
348 (11) (11 S. E. 659) ; *Crabb* v. *State,* 88 *Ga.* 584 (15 S. E.
455) ; *N. E. R. Co.* v. *Morris,* 59 *Ga.* 364 (1, 2), 368; *City Council
of Augusta* v. *P. R. & A. Ry. Co.,* 74 *Ga.* 658 (2), 661; *Johnson*
v. *Jones,* 87 *Ga.* 85 (13 S. E. 261) ; *McDuffie* v. *State,* 87 *Ga.*
687 (13 S. E. 596) ; *Harris* v. *State,* 101 *Ga.* 887; *Dempsey* v.
*State,* 94 *Ga.* 766, 768 (22 S. E. 57) ; *Ayeridge* v. *Social Circle,* 60
*Ga.* 404; *Arrington* v. *State,* 148 *Ga.* 115 (95 S. E. 980) ; *Sister
Felicitas* v. *Hartridge,* 148 *Ga.* 832 (1, 2), 838 (98 S. E. 538) ;
*Brown* v. *State,* 79 *Ga.* 324 (4 S. E. 861).

But these cases are distinguishable from the case at bar; and
we feel constrained to hold that the 34th section of the act of 1922,
supra, and other portions of it attacked, are not in violation of
art. 3, sec. 7, par. 8, of the constitution of Georgia (Civil Code of
1910, § 6437), for any reason assigned.

3. The act of 1922 (Acts 1922, pp. 457, 473, sec. 34) provides
that before the provisions of the act shall go into effect the same

shall be ratified by the people at the next election for the choice
of councilmen under the present charter, the wards being given
an opportunity to vote on the issue, and the election to be held
under the same rules and regulations and requirements of voters
and registration as now exist for the holding of general city elec-
tions and for the certification and returns of the same.    It was
also provided that " those who were registered and qualified voters
in the city election of 1921 for the choice of mayor and council
shall be deemed registered and qualified voters for said election in
1922, unless disqualified by residence requirements or failure to pay
required taxes under the law, and shall not be required to register
again in order to vote in said election.    Those who did not register
and qualify for the said election in 1921 shall be permitted to reg-
ister and qualify for said election in 1922 after the manner and
method now provided in the present city charter of Albany for the
registration of voters according to wards for the choice of council-
men," etc. It was also provided that at the election the " ballots fur-
nished voters for this said election shall have printed thereon ' for
commission city-manager form of government,' and the voter shall
erase or draw a line through the wording which does not express
his or her choice, unless a majority of the registered qualified
voters appearing on the official registration list for said election
shall vote ' against commission city-manager form of government,'
then and in that event this act shall be deemed ratified and in full
force and effect according to its terms on the second Monday in
January, 1923, as hereafter provided.    In the said event, the said
mayor and council should refuse or fail to call or hold said election
on the date named for the ratification of this act, then said act
shall be deemed ratified and go into effect according to its terms
without any election or referendum, on the date herein provided."
An election was held on December 4, 1922, and the present case
grows out of the result of that election.    The record shows that
889 votes were cast in favor of the " commission city-manager
form of government," and that 1173 votes were cast against
the " commission city-manager form of government."    The
registration list under which the election was held was pre-
pared and furnished by the mayor and council of the City
of Albany.    An order was also drawn and signed by the clerk
of council in accordance with the figures given above, and

declaring that the "commission city-manager form of government" had been adopted at said election for the City of Albany. Subsequently the mayor and council employed two men to go into the registration list of 1921 and to purge it of names which it was contended were not there in accordance with law. In this new registration list, provided by this committee subsequently to the election, the names of 257 women voters were excluded, and certain other names, one because the man had been convicted of crime; and after purging the registration list the mayor and council adopted another ordinance setting forth the fact that, with these names eliminated from the registration list of 1921, a majority of the legal voters at the election of December 4, 1922, were cast against the "commission city-manager form of government," and they therefore declared that the commission form of government had not been adopted by the voters of the City of Albany on December 4, 1922 according to the newly purged registration list of 1921. The question, therefore, arises whether the mayor and city council of Albany, after having declared by written resolution the result of the election, could subsequently rescind that order and purge the registration list of 1921 and pass the second order declaring that the commission form of government had not been adopted. We are of the opinion that when the original order declaring the result of the election was passed and signed by the clerk of the mayor and council with the seal of office attached, although that order was not signed by the mayor, *prima facie* such order was authorized by the mayor and city council, and it exhausted the power and authority of the mayor and city council in the matter. The charter of the City of Albany (Acts 1917, p. 464, sec. 6, par. 14) provides that the mayor and council are required to declare the result of all elections at the first meeting held after the election. The record shows that a meeting of the mayor and council was held after the election on December 12, 1922, and that the mayor and council, as evidenced by the order signed by the clerk, declared the result of the election in compliance with the provisions of the charter above specified, and based upon the registration list prepared and furnished by the mayor and council. The clerk signed this order with the official seal of the City of Albany attached, certifying that it was a true and correct copy of the original resolution of file in his

office. When the order was so signed it imported verity upon its face. It was also a final order which could not be arbitrarily rescinded and set aside. The resolution adopted by the mayor and city council, which was signed by the clerk, and which declared the election carried in favor of the " commission city-manager form of government," also provided that the resolution and the certificates of the managers of the election should be spread upon the minutes of the mayor and council. The record shows that the resolution was never spread upon the minutes of the mayor and council, but there is nothing in the record to show that the resolution was not passed by the mayor and council in the form in which it is set forth in the record. And the second resolution itself recites that, prior to the confirmation of the minutes of the meeting held December 12, 1922, the second resolution was considered and adopted on January 2, 1923, and it is by this latter resolution that the mayor and council sought to rescind its action as a canvassing board declaring the result of the election on December 12, 1922, in favor of the " commission city-manager form of government." It is insisted on the part of the plaintiffs that the registration list of 1921, under which the election was held, was not conclusive as to the qualifications of the voters whose names appeared thereon; and the question arises whether the mayor and council, in acting as canvassers of the returns of the election and declaring the result, can go behind the registration list to investigate whether the persons whose names appeared thereon, and who had not voted, were really qualified voters to be counted as determining whether a majority of the qualified voters of Albany had voted against the ratification of the acts of 1922, supra. On the argument here it is conceded that the registration list of 1921 was prima facie correct as to the qualifications of the voters whose names appeared thereon; but it is contended that it was not conclusive, for the reason that the acts themselves show that it was not the legislative intent that the list would be conclusive on the courts, and that the courts in cases like the present must decide for themselves, under the evidence adduced, whether all the persons whose names appeared on the registration list were really qualified voters who should be counted in determining whether a majority of the qualified voters had voted for or against the adoption of the questions submitted. But that is a different

question from having a board of canvassers, who have declared the result of the election, subsequently to rescind their order and have an entirely new list of registered voters made up, eliminating 585 persons of the 2795 whose names appeared on the "official registration list" as prepared and furnished by the mayor and council themselves prior to the election. We are of the opinion that the mayor and council, acting as a canvassing board, exhausted all of the powers they had as such canvassing board when they passed the order on December 12, 1922; and although, as stated above, that order was signed only by the clerk, yet the mayor and council recognized it as a valid order when they subsequently sought to and did formally rescind it by another order. While it is true that the charter of Albany contains a provision requiring that all ordinances and resolutions shall be signed by the mayor or the officer presiding at the time of their passage, and countersigned by the clerk (Acts 1917, p. 487, sec. 21, par. 2), these provisions are directory only. *Moore* v. *Thomasville,* 17 *Ga. App.* 285 (86 S. E. 641), and authorities cited; *Jones* v. *Carrollton,* 17 *Ga. App.* 476 (87 S. E. 605). In the act of 1917, pp. 454, 464, it is provided that "the mayor and council shall, at their first meeting after the election, receive said returns from the clerk of council and declare the result of the election in accordance with the certificate of the managers, those receiving the highest number of votes being declared elected, or the question voted upon being declared carried or not carried, as the case may be, which certificate, together with the resolution of the council declaring the results of the election, shall be entered upon the minutes of the council." We think that the duties of the mayor and council here defined are those of a canvassing board, and that the board can not go outside of the official returns and receive evidence as to the qualifications of voters, or act in any way in connection therewith except to declare the result of the election on any evidence except the official returns.

In 20 C. J. 204, § 263, it is said that "When a board of canvassers has fully performed its duty, proclaimed the result of the count according to law, and adjourned sine die, it is functus officio; the persons who compose it have no power voluntarily to reassemble and recanvass the returns. Neither have their successors in office power to recanvass returns already canvassed by the old board. Where a canvass has been concluded under the

statutory provisions for its conduct existing at the time, the legislature has no power to create a new tribunal with power to recanvass the election and to award possession of the office to another claimant. However, the fact that a board of canvassers canvasses part of the returns, declares the result, and adjourns sine die, does not deprive it of authority or relieve it of the duty to reassemble and canvass all the returns. After county canvassers have forwarded an abstract of votes for certain offices to the secretary of State to be canvassed by the State canvassing board, a change made subsequently by them in such abstract is a nullity, but there is nothing improper in their action in subsequently completing their duties by forwarding the abstracts of votes for other offices." And in section 265 of the same volume it is said that "After a board of canvassers has completed the count and awarded a certificate of election, another certificate of election awarded to an opposing candidate, based upon a voluntary recanvass by the board, is a nullity." And see sections 200, 254, and 258. The latter section reads in part as follows: "It is settled beyond controversy that canvassers can not go behind the returns. The returns provided for by law are the sole and exclusive evidence from which a canvassing board, or official, can ascertain and declare the result. The canvassers are not authorized to examine or consider papers or documents which are transmitted to them with the returns, or as returns, but which under the statutes do not constitute part of the returns. Neither are they at liberty to receive and consider extrinsic evidence, unless the official returns are destroyed before they are canvassed, in which case secondary evidence of their contents may be received."

In State ex rel. King v. Trimbell, 12 Wash. 440 (41 Pac. 183), it was held: "The canvassing board can not go behind the returns of the election officers to determine the results of an election." And see Stearns v. State ex rel. Biggers, 23 Okla. 462 (100 Pac. 909). And in Kunkle v. Coleman, 174 Ind. 315 (92 N. E. 61), it was held that "The duties of canvassers are purely ministerial; they perform the mathematical act of tabulating the votes of the different precincts as the returns come to them." See People ex rel. Del Valle v. Butler, 20 Cal. App. 379 (129 Pac. 600) ; State ex rel. Fletcher v. Osburn, 24 Nev. 187 (51 Pac. 837), where it was held that "The determination as to the result of an

election by a canvass of the returns by the city council is not a judicial act, but is purely a matter of calculation, and hence can not be brought up for review by certiorari;" Payne *v.* Hodgson, 34 Utah, 269 (97 Pac. 132); Lewis & Putner's Hand Book of Election Laws, 148; Jay *v.* O'Donnell, 178 Ind. 282 (98 N. E. 349, Ann. Cas. 1915C, 325); Potter *v.* Campbell, 155 Ky. 784 (160 S. W. 763); Attorney-General *v.* Board of Canvassers, 64 Mich. 607 (31 N. W. 539); Mechem on Pub. Officers, §§ 207-8-9; McCoy *v.* State ex rel. Allee, 2 Marv. (Del.) 543 (36 Atl. 81); Franklin County *v.* State ex rel. Patton, 24 Fla. 55 (3 So. 471, 12 Am. St. R. 183); Lansdon *v.* State Board of Canvassers, 18 Idaho, 596 (111 Pac. 133); State ex rel. Norton *v.* Van Camp, 36 Neb. 9, 91 (54 N. W. 113); Gatling *v.* Boone, 98 N. C. 573 (3 S. E. 392); Chamberlain *v.* Hedger, 12 S. D. 135 (80 N. W. 178); People ex rel. Sherwood *v.* State Board, 129 N. Y. 360 (29 N. E. 345, 14 L. R. A. 646); Brown *v.* Jeffries, 42 Kan. 605 (22 Pac. 578); People ex rel. Derby *v.* State Board of Canvassers, 129 N. Y. 461 (29 N. E. 358); Wells *v.* Robertson, 277 Ill. 534 (115 N. E. 654; 656); Hart *v.* State Board of Canvassers, 161 N. Y. 507 (55 N. E. 1058); State ex rel. Pigott *v.* Board, 12 Mont. 537 (31 Pac. 536); Pratley *v.* State ex rel. Campbell, 17 Wyo. 371 (99 Pac. 1116); State ex rel. Gregg *v.* Tanzey, 49 Ohio St. 656 (32 N. E. 750). In *Tanner* v. *Deen,* 108 *Ga.* 95 (33 S. E. 832), this court said that "This action on the part of these superintendents amounted to nothing, first, because it was done without any notice to the superintendents of the other party and without their knowledge; second, because it was in violation of the restraining order issued by the judge; and third, because it was impossible for them to have consolidated the returns of the county without having such returns before them."

In Mechem on Public Officers, § 211, it is said that "Board can act but once. But having once met and fully completed their duty, their powers are exhausted, and they can not again meet and re-canvass the votes or reverse their prior decision and announce a different result." And this rule seems to be the logical result of our elective system. If canvassing boards can meet and change the results which they have once declared, they can also meet and change the results any number of times. Serious and injurious results might follow if such powers were held to exist in canvassing

boards. When they have met and canvassed the returns of an election and declared the result, they have exhausted their powers, and have no authority to meet and recanvass the result of an election and to declare a different result. In the instant case it appears that the second action of the mayor and council was founded, not on the returns of the managers of the election, or on the certificate of election, but upon the extrinsic and ex parte evidence of outsiders; and we are of the opinion that the resolution adopted by the mayor and council on December 12, 1922, declaring the result of the election, was prima facie correct and could not be changed by the subsequent action of the canvassing board.

What has been said above, with reference to the adoption of the " commission city-manager form of government " act, applies also to the creation of a new school board for the City of Albany, which was submitted at the same time to a vote of the qualified voters of Albany.

4. After all of the evidence in the present case was before the court the trial judge announced his rulings on the issues in the case, as appears from the bill of exceptions, as follows: 1. The court holds that the registration lists for the several wards as prepared by the registrars and delivered by them to the clerk of council of the City of Albany, and later delivered to the managers of the election and used in the election held December 4, 1922, were conclusive upon both the mayor and council in declaring the result of the election, and upon the court in the decision of this case, and neither of the tribunals could go behind the registration list to ascertain whether or not any of the voters named thereon, who did not vote in the election, should be counted and considered as qualified voters, in estimating whether a majority of the registered qualified voters of the City of Albany voted against the ratification of the acts mentioned in plaintiffs' petition. 2. The court holds that the declaration of the result of the election by the mayor and council of Albany as a canvassing board, as shown by the resolution in evidence adopted December 12, 1922, is conclusive upon both the mayor and council as such board, and upon the court, and that the resolution was duly adopted and of force notwithstanding the fact that it was not signed by the mayor or entered on the minutes of the mayor and council, and that when the resolution was passed the power of the mayor and council as a

canvassing board over the matter ceased, and they had no power to reconvene later as a canvassing board and pass the resolution of January 2, 1923, based partly upon evidence outside of the returns of the managers of the election; and therefore the resolution of January 2, 1923, is null and void. 3. The court holds also that those women voters whose names appear on the registration list prepared by the registrars for the election to be held on December 4, 1922, and used in said election, who had registered in 1921, and who did not vote in the election, who were otherwise qualified, were not disqualified to vote in the election of December 4, 1922, by reason of the fact that they had not paid any poll-tax for the year 1921. The court below held that the plaintiffs in this bill are not entitled to the injunction prayed for, but that the defendants who have prayed for injunction are entitled to the injunction prayed for by them. The rulings of the court below set out above have been treated in the foregoing divisions of this opinion, except as to the ruling made in the third subdivision above with reference to the alleged disqualification of those women whose names appeared on the registration list, and also as to whether in a proceeding like the present the court could go behind the registration list in order to declare the election void if it should appear from such investigation that such is the case. Having held in the third division of this opinion that the consolidation of the vote of the election held on December 4, 1922, was prima facie correct, we are now called upon to decide whether or not in a proceeding like the present, attacking the election, the court may go behind the returns of the consolidating board and receive evidence establishing what votes were actually cast and whether the registration list contained names that should not be placed thereon. We are of the opinion that it is competent for the court to do so. *Coleman* v. *Board of Education of Emanuel County,* 131 *Ga.* 643 (63 S. E. 41); 9 R. C. L. 1113, § 116. And see *Chapman* v. *Sumner School Dist.,* 152 *Ga.* 450 (2, e) (109 S. E. 129); *Garrett* v. *Cowart,* 149 *Ga.* 557, 564 (101 S. E. 186); *Mayor* v. *Wade,* 88 *Ga.* 699 (16 S. E. 21); *Richter* v. *Chatham County,* 146 *Ga.* 218 (91 S. E. 35); *Mays* v. *City of Jackson,* 147 *Ga.* 556 (94 S. E. 1006); *Brown* v. *City of Atlanta,* 152 *Ga.* 283 (109 S. E. 666); *Brumby* v. *City of Marietta,* 132 *Ga.* 408 (64 S. E. 321); *Davis* v. *City of Dawson,* 90 *Ga.* 817 (17 S. E. 110); *Tanner* v. *Deen,* supra; *Hammond* v.

*Clark,* 136 *Ga.* 314 (71 S. E. 479, 38 L. R. A. (N. S.) 77). It is contended on the part of the plaintiffs that there appears on the registration list of 1921 the names of 585 voters who were, while registered, not qualified to vote in the city election held on December 4, 1922, as required by law; and that, deducting that number of votes from the registration list of 1921, the correct number was 2210, and those voting in the election of December 4, 1922, against the adoption of the amendment to the charter of the City of Albany, did not constitute a majority of the qualified registered voters for 1921; and therefore that the election was not legally carried as provided in the act of 1922, supra. Evidence was offered by the plaintiffs, tending to establish the above contentions. An affidavit of Aubrey Allen was introduced in evidence in behalf of the plaintiffs, in which he deposed that he had made a personal investigation of the tax-digest of the County of Dougherty for the year 1921; that certain names that appeared on the registration list for that year do not appear on the tax-digest for that year, and that the names aggregate 501 in number; that from an examination of the tax-digest of Dougherty county for the years 1921-2 appears a list of names which do not appear on the tax-digest of Dougherty County for either of the years 1921 or 1922 as having paid their poll-tax; that the names appear on the registration list of the City of Albany for the year 1921, and that the names aggregate 314 in number; that on said list appear certain names which appear twice, the names appearing in separate wards, to the number of 39; and another list of 187 in number who had moved away from the city or had moved from one ward into another without reregistering in the ward in which they had moved, as required by law; that the registration list contained the names of 44 who had been registered in the year 1921, against whom were tax executions for unpaid taxes for 1921; that the registration list contained the names of various persons who, at the time the registration list was closed, and at the time the election was held on December 4, 1922, were dead, or not naturalized citizens, or were confined in the penitentiary, or were not qualified to vote in the election, to the number of 6; and that all the names above referred to appearing on the official registration list aggregate 585 in number. The defendants offered in evidence a certified copy of an executive order signed by Thomas

W. Hardwick, Governor of Georgia, dated December 14, 1922, appointing H. A. Peacock of Albany, Georgia, recorder of the City of Albany, for a term of twelve months beginning the second Monday in January, 1923, " in accordance with the provisions of the act approved August 21, 1922." Also a certified copy of the resolution passed September 14, 1922, providing for a board of registrars for the City of Albany consisting of " three upright and intelligent citizens of the City of Albany, who shall be appointed, upon the passage of this ordinance, by the mayor and council for a term of not exceeding one year," etc. The defendants also introduced a certified copy of a resolution passed December 12, 1922, by the mayor and council of Albany declaring the result of the election of December 4, 1922, that " neither of said acts having been voted against by a majority of all of the qualified voters of the city qualified to vote in said election, the question ' for city-manager commission form of government ' is hereby declared carried, and the question ' for new city school board ' is hereby declared carried." Plaintiffs then introduced in evidence certified copy of a resolution of the mayor and council of the City of Albany, dated January 2, 1923, purporting to declare null and void and to rescind the resolution of December 12, 1922, which has been heretofore alluded to in this opinion.

Of the 314 names appearing on the registration list for 1921 it is contended that 257 of the names were those of women who had not paid their poll-tax for the years 1921 and 1922, and it is therefore insisted that these women whose names appear on the registration list were disqualified to register in 1921 and to vote in the election of December 4, 1922, and that therefore their names should not have appeared upon the registration list of 1921 as legally qualified voters in 1922.

The 19th amendment to the constitution of the United States became operative on August 26, 1920. The terms of that amendment are as follows: " The right of citizens of the United States to vote shall not be denied or abridged by . . any State on account of sex." The plaintiffs insist that upon the 19th amendment becoming effective women were subject to the payment of poll-tax the same as men, from that date, and that they were liable for the payment of such tax from the date on which such amendment became effective; and it is argued that from that date

no State could require a poll-tax from men as a condition precedent to their right to vote, unless it also required the same poll-tax from all women as a condition precedent to their right to register and vote; for otherwise, it is argued, the State would be abridging the right of a man to vote by requiring of him the payment of a poll-tax, while it did not require the payment of such poll-tax from a woman as a condition precedent to her right to vote; and a decision of the Supreme Court of Alabama is cited in support of the proposition that under the 19th amendment to the constitution of the United States, women are required to pay poll-tax the same as men, as a condition precedent to their registering and voting. The decision alluded to is that of Graves v. Eubanks, 205 Ala. 274 (87 So. 587) (1, 2, 3), where it was held: " Constitution U. S. Amendment 19, giving women the right to vote, automatically struck out from the State constitution and statutes all discriminatory features authorizing only one sex to vote, or placing conditions or burdens on one not placed on the other as a condition precedent to the right to vote. 2. Constitution U. S. Amendment 19, providing that the right to vote shall not be denied or abridged on account of sex, automatically struck from constitution Alabama 1901, p. 177, the word ' male,' as used in defining who are or who may become electors. 3. Constitution U. S. Amendment 19, providing that the right to vote shall not be denied on account of sex, made Constitution of Alabama 1901, p. 178, 194, making the payment of a poll-tax a condition precedent to the right to vote, applicable to women as well as men," And it is insisted that the Supreme Court of Georgia approved the decision of the Alabama Supreme Court in the Graves case, supra, saying: " The 19th amendment to the constitution of the United States, providing that the right to vote shall not be denied or abridged on account of sex, is self-executing, and removed the electoral disqualification on account of sex." In *Brown* v. *Atlanta,* supra, this court said: " The constitution of the United States is the supreme law of operation in this State. Civil Code (1910), § 1. The 19th amendment became automatically operative on August 26, 1920. Graves v. Eubanks, 205 Ala. 174 (87 So. 587). We are of the opinion that that amendment is self-executing, and that under it females are not now disqualified on account of their sex to register and to vote, but on the contrary they are qualified."

Civil Code § 917, before it was amended, read as follows: "Upon each and every male inhabitant of the State, between the ages of 21 and 60 years on the days fixed for the return of property for taxation, a poll-tax of one dollar, which shall be for educational purposes in instructing children in the elementary branches of an English education only; provided, this tax shall not be demanded of blind persons, nor persons who have lost a limb or limbs, or the use of the same, while actually engaged in the military service of the late Confederate States." Under the ruling in the *Brown* case females were not disqualified on account of their sex to register and to vote because they had not paid a poll-tax, and thus the law stood until August 15, 1921, when the legislature passed an act (Acts 1921, p. 38, sec. 2, par. 1) providing that "Upon each and every inhabitant of the State between the ages of 21 and 60 years on the days fixed for the return of property for taxation a poll-tax of one dollar, which shall be for educational purposes," etc. The only difference between the act of 1921 and Civil Code § 917, quoted above, is that the word "male" is stricken; and it was the evident purpose of the legislature by the act of 1921 to impose a poll-tax upon women, where it had not been imposed before. Section 1 of the above-recited act of 1921 provides that "the terms and provisions of this act shall not take effect and become operative until January 1, 1922, and shall continue thereafter." Therefore, by the express terms of the act itself, no poll-tax was imposed upon women of the State of Georgia until January 1, 1922. Of course the statute could not be retroactive. The election in the present case was held on December 4, 1922. Art. 2, sec. 1, par. 3, of the constitution of Georgia (Civil Code of 1910, § 6397) provides that "To entitle a person to register and vote at any election by the people, he shall have resided in the State one year next preceding the election, and in the county in which he offers to vote six months next preceding the election, and shall have paid all taxes which may have been required of him since the adoption of the constitution of Georgia of 1877, that he may have had an opportunity of paying agreeably to law. Such payment must have been made at least six months prior to the election at which he offers to vote, except when such elections are held within six months from the expiration of the time fixed by law for the payment of such taxes." No poll-tax was required to be paid by

women in this State until January 1, 1922, and the expiration of the time fixed by law for the payment of taxes for that year was December 20. Civil Code (1910), § 1229; Acts 1917, p. 197. The election was held on December 4, 1922, prior to the expiration of the time for the payment of taxes for that year; and therefore under the constitutional provision above quoted, if their names appeared on the registration list for 1921, they were legally qualified voters so far as not having paid a poll-tax for the year 1922 is concerned. Holding, therefore, that the 257 women whose names appeared on the registration list of 1921 to be qualified legal voters so far as the nonpayment of a poll-tax for the year 1921 or 1922 is concerned, the elimination of those names was illegal. In the affidavit of Aubrey Allen, a witness for the plaintiffs, he states that he struck from the registration list of 1921 314 names, on the basis that he had examined the tax-digest of Dougherty County for the years 1921 and 1922, and that those 314 names do not appear on such digest for those years, and that none of the persons bearing said names paid their poll-tax required by law. This number, which includes the names of the 257 women, must be reduced by that number and the 257 names restored to the registration list, which plaintiffs contend contains only 2210 legally qualified voters, thus making a total of 2467, and a majority of that number would be 1234. There were only 1173 votes cast against the city-manager commission form of government, and the school-board act; and therefore a majority of the legally qualified voters not having voted against the acts, under their terms, they went into effect, a sufficient number of votes not having been cast against them. Having reached this conclusion, it becomes unnecessary to pass upon the qualifications of the other names purged from the registration list of 1921 by the finding of Aubrey Allen, which was adopted by the mayor and council of the City of Albany.

*Judgment affirmed. All the Justices concur, Beck, P. J., and Atkinson and Hines, JJ., specially.*