THOMPSON, Lieutenant Governor, *et al. v.* TALMADGE.

BYARS *et al. v.* THOMPSON.

FULTON NATIONAL BANK OF ATLANTA *v.* TALMADGE *et al.*

THOMPSON *et al. v.* TALMADGE *et al.*

868

Nos. 15797, 15792, 15798, 15802.   MARCH 19, 1947.

**870**

*Eugene Cook*, Attorney-General, *Charles S. Reid, James A. Branch, Thomas B. Branch Jr., Marshall L. Allison, C. E. Gregory Jr., Marion Smith, Harry Baxter, H. H. Perry Jr., A. B. Conger, J. B. Copeland, Beverly Irwin, Victor Davidson, Claude Shaw,* Assistant Attorneys-General, *Frank M. Gleason, Graham Wright, A. W. Cain Jr.,* and *Paul W. Painter,* for Thompson *et al.*

*Samuel D. Hewlett, C. Baxter Jones, W. S. Mann, B. D. Murphy, R. O. Jackson, W. A. Ingram, J. Roy Rowland, Spence M. Grayson, W. G. Grant, Joseph D. Quillian, George P. Whitman, Edgar Dunlap, A. M. Zellner, Lewis A. Mills, Claude V. Driver, B. B. Heery, W. O. Cooper, C. T. Woodell, W. P. Whelchel, Ed Wohlwender, Shelby Myrick, L. P. Goodrich, James N. Frazer, C. Baxter Jones, W. S. Mann,* and *Winfield Payne Jones,* for Talmadge.

*Gordon Lee Sullivan, Leon Covington,* and *Matthews, Owens & Maddox,* for Byars *et al.*

*Devereaux F. McClatchey* and *A. G. Cleveland Jr.,* for Fulton National Bank.

*Millard Reese, Paul E. Bryan, Kennedy & Fortson, Frank Lowson, R. W. Collins, R. S. Wimberly, John Anderson McDuff,* and *Charles W. Anderson,* as amici curiæ.

DUCKWORTH, Presiding Justice. (After stating the foregoing facts.) ■ That the trial courts had jurisdiction .in each of these cases to adjudicate all questions there raised that are collateral to the main question as to which of the contending parties is entitled to perform the duties of Governor of this State can not be seriously questioned. But it is stoutly maintained by counsel for Mr. Talmadge that the courts were without jurisdiction to adjudicate the principal question as to whether or not Mr. Talmadge is the lawful Governor of this State. The grounds upon which this contention is predicated are that it is a purely political question; that it has been determined by the General Assembly which under the Constitution has exclusive jurisdiction; and that the action of that body is not subject to review by the courts.

In the oral argument in this court counsel expressly waived all procedural questions, thus enabling us to move at once to a consideration of the main and controlling questions, the first of which is jurisdiction as just above stated. That the judiciary under the Constitution is wholly without jurisdiction to adjudicate a purely political question is not an open question. Also, it is the settled law of this State that actions of the General Assembly taken in virtue of a power conferred by the Constitution and in conformity with the provisions of the Constitution are not subject to review by the courts. The law is equally as well settled that the judiciary is by the Constitution given the power and jurisdiction to adjudicate any and all justiciable questions presented to it in litigation, and that this jurisdiction of the courts is neither ousted nor impaired by the fact that there may be involved in such cases political questions, or actions by the General Assembly. Counsel on each side have filed in this court exhaustive briefs on the question of jurisdiction to adjudicate the principal issue as to the title of Herman Talmadge to the office of Governor and have cited a number of decisions from courts of other jurisdictions, some of which involved the question as to who was the lawful Governor. The cases cited will not here be extensively discussed. We think it sufficient to state that they, in a general way, tend to support the respective positions of the parties citing them. Counsel for Mr. Talmadge cite: Pacific States Telephone & Telegraph Co. *v.* Oregon, 223 U. S. 118 (32 Sup. Ct. 224, 56 L. ed. 377); Coleman *v.* Miller, 307 U. S. 433 (59 Sup. Ct. 972, 83 L. ed. 1385, 122 A. L. R. 695);

Taylor v. Beckham, 108 Ky. 278 (56 S. E. 177, 49 L. R. A. 258, 94 Am. St. R. 357) ; Carr v. Wilson, 32 W. Va. 419 (9 S. E. 31, 3 L. R. A. 64) ; Goff v. Wilson, 32 W. Va. 393 (9 S. E. 26, 3 L. R. A. 58) ; State ex rel. Brooks v. Baxter, 28 Ark. 135; Dickson v. Strickland, 114 Texas 176 (265 S. W. 1012). Counsel for Mr. Thompson cite: Bashford v. Barstow, 4 Wis. 567; State ex rel. Morris v. Bulkeley, 61 Conn. 287 (23 Atl. 186, 14 L. R. A. 657) ; Thayer v. Boyd, 31 Neb. 682 (43 N. W. 739) ; In re Moore, 4 Wyo. 98 (31 Pac. 980) ; State ex rel. Olson v. Langer, 65 N. D. 68 (256 N. W. 377) ; State ex rel. Sathre, Attorney-General, v. Moodie, 65 N. D. 340 (258 N. W. 558) ; Ex parte Lawhorne, 59 Va. 85; Ex parte Smith, 8 S. C. 511; Attorney-General v. Taggart, 66 N. H. 362 (29 Atl. 1027, 25 L. R. A. 613) ; State ex rel. Trapp v. Chambers, 96 Okla. 78 (220 Pac. 890, 30 A. L. R. 1144) ; State ex rel. Martin v. Heil, 242 Wis. 47 (7 N. W. 2d, 375) ; Carr v. Wilson, 32 W. Va. 419 (9 S. E. 31, 3 L. R. A. 64). While it appears from an examination of all of the cited cases that a majority of those courts have exercised jurisdiction in cases similar in some respects to the cases we are now called upon to decide, yet it can not be said that those decisions are sufficient to settle the question of the jurisdiction of our courts to adjudicate the ultimate issue here made. We, therefore, look to the law of this State as embodied in the Constitution and the decisions of this court in arriving at a decision on such jurisdictional question, bearing in mind, however, the decisions of courts of other jurisdictions in so far as they may shed light upon the question.

The Constitution vests all legislative power in the General Assembly. Article 3, sec. 1, par. 1. It vests all judicial power in the courts. Art. 6, sec. 1, par. 1. It commands that these powers remain forever separate and distinct. Art. 1, sec. 1, par. 23. This court in McCutcheon v. Smith, 199 Ga. 685 (35 S. E. 2d, 144), citing in the opinion a number of older decisions supporting its ruling, held that construing the Constitution and the statutes is the function of the judiciary, and that the General Assembly has no power to make such construction. By this was meant that determining the meaning of the Constitution, which is binding upon everyone, was the exclusive function of the courts in the adjudication of cases properly brought before them for decision. Therefore, it must be held that if in the present cases a construction of the Constitu-

tion is involved, that is a justiciable question which the courts have the exclusive jurisdiction to adjudicate in determining such cases. While there is presented here no law enacted by the General Assembly, the constitutionality of which is drawn in question, there is a formal resolution which followed publication of the election returns, and this is challenged and must be construed. The power of the judiciary to declare void unconstitutional "acts" of the legislature is expressed in art. 1, sec. 4, par. 2 of the Constitution. Whether or not this provision has reference solely to laws enacted by that body, it is indicative of the supreme power of the judiciary in its field of construction as between parties litigant, and certainly no action of the General Assembly is of higher dignity or importance, or would require greater constitutional power, than that of solemnly enacting the laws of this State. Manifestly a department of the State government vested with the power to declare void laws enacted by the legislature has a power broad enough to declare void other actions of that department, which are of less dignity, if they are found to have violated the Constitution and to be an infringement of right.

In *Beall* v. *Beall,* 8 *Ga.* 210, this court, after stating that in measures exclusively of a political, legislative or executive character, the supreme authority belongs to the legislative and executive departments, and that the mode of executing such powers could never become the subject of inquiry and investigation by the courts, further said: "But were this or any other question of a different nature, and capable of judicial inquiry and decision, then it would admit of a very different consideration—the action of either of the other departments, whether legislative or executive, being capable, in its own nature, of being brought to a judicial test, is subject to judicial review. It is, in all such cases, as we conceive, that the judicial authority is the final and common arbiter, provided by the Constitution itself, and to whose decisions all others are subordinate," citing Story on the Constitution.

In *Low* v. *Towns,* 8 *Ga.* 360, this court, speaking of the question of the validity of the title to a public office, said: "The validity of the title to an office created by law, is a *judicial* question—one which it is not only the duty of the courts to decide, but one which, in our judgment, it is the exclusive province of the judiciary department to determine, notwithstanding the Governor may have

commissioned one of the claimants." In *State* v. *Dews, R. M. Charlton* 397, it was said at page 400 : "Legislative power is that which declares what the law *shall be;* judicial is that which declares what law *is,* and applies it to past transactions and existing cases; the one makes the law, the other expounds and judicially administers it; the one prescribes a rule of civil conduct, the other interprets and enforces it in a case in litigation." We have in this State a government of laws under a written Constitution. It requires the full discharge of their respective functions by each of the three coordinate departments of government to effectually operate the government and administer the laws. There is provided in this governmental scheme no other authority for the orderly adjudication and settlement of justiciable cases except the judicial department. Failure on the part of the judiciary to function would leave all such matters unsettled, and anarchy would prevail. This is not to say that the judiciary does or can control either of its coequals, the executive and the legislative departments, but in virtue of the power vested in it by the Constitution the judiciary can and must, when called upon in a case before it, adjudicate and decide all justiciable questions, whether they relate to the action of the other departments or not. If any department of the government, including the judiciary, acts beyond the bounds of its authority, such action is without jurisdiction, is unconstitutional, and is void. It is declared in the Code, § 89-903, that the public is not estopped by the acts of an officer done in the exercise of a power he never had. See also *Motes* v. *Davis,* 188 *Ga.* 682 (4 S. E. 2d, 597, 125 A. L. R. 289). "The judgment of a court having no jurisdiction of the person or subject-matter, or void for any other cause, is a mere nullity, and may be so held in any court when it becomes material to the interest of the parties to consider it." Code, § 110-709. And so it must be with any action of the General Assembly that is without the realm of its jurisdiction.

In the field of enacting laws general and broad power is given to the legislative department. If in the exercise of this power, which is unquestionably conferred upon it, the General Assembly merely fails to observe certain rules of internal procedure, the judiciary would not be authorized to review such action; and the same would be true as to any action of the officers of that body within the sphere of their jurisdiction. Compare *White* v. *For-*

*syth,* 138 *Ga.* 753 (2) (76 S. E. 58); *Bachlott* v. *Buie,* 158 *Ga.* 705 (124 S. E. 339); *Williams* v. *MacFeeley,* 186 *Ga.* 145 (197 S. E. 225). There is, however, a marked and fundamental difference, between instances of incorrectly exercising unquestioned power and of exercise of a power never possessed.

The cases here presented do not involve an election contest, but they do involve questions as to the title to the highest office in the State government, including construction of the Constitution as to the jurisdiction of the General Assembly to elect a Governor under provisions of the Constitution (quoted infra), and the courts have jurisdiction to decide such questions.

■ As to the election of a Governor the Constitution of 1945 contains the following provisions: "The first election for Governor, under this Constitution, shall be held on Tuesday after the first Monday in November of 1946, and the Governor-elect shall be installed in office at the next session of the General Assembly. An election shall take place quadrennially thereafter, on said date, until another date be fixed by the General Assembly. Said election shall be held at the places of holding general elections in the several counties of this State, in the manner prescribed for the election of members of the General Assembly, and the electors shall be the same." Constitution, art. 5, sec. 1, par. 2 (Code, Ann. Supp., § 2-3002; Ga. L. 1945, p. 32). "The returns for every election of Governor shall be sealed up by the managers, separately from other returns, and directed to the President of the Senate and Speaker of the House of Representatives, and transmitted to the Secretary of State, who shall, without opening said returns, cause the same to be laid before the Senate on the day after the two houses shall have been organized, and they shall be transmitted by the Senate to the House of Representatives." Constitution, art. 5, sec. 1, par. 3 (Code, Ann. Supp., § 2-3003; Ga. L. 1945, p. 32). "The members of each branch of the General Assembly shall convene in the Representative Hall, and the President of the Senate and Speaker of the House of Representatives shall open and publish the returns in the presence and under the direction of the General Assembly; and the person having the majority of the whole number of votes, shall be declared duly elected Governor of this State, but, if no person shall have such majority, then from the two persons having the highest number of votes, who shall be in life, and shall not decline

an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce; and in all cases of election of a Governor by the General Assembly, a majority of the members present shall be necessary to a choice." Constitution, art. 5, sec. 1, par. 4 (Code, Ann Supp., § 2-3004; Ga. L. 1945, p. 32). The Constitution also provides: "Contested elections shall be determined by both houses of the General Assembly in such manner as shall be prescribed by law." Constitution, art. 5, sec. 1, par. 5 (Code, Ann Supp., § 2-3005; Ga. L. 1945, p. 32).

In view of these provisions, did the General Assembly have power to elect a Governor under the circumstances that existed when they proceeded to elect Mr. Talmadge? The resolution adopted by that body is set out in the statement of facts preceding this opinion. It is therein recited that the General Assembly opened and published the returns of the election for Governor held on November 5, 1946. While it declares that no person at that time had a majority of the votes, it shows that the one and only reason for such conclusion was the fact that Eugene Talmadge who received the highest number of votes cast had departed this life. There is nowhere in the resolution a statement of fact that the election returns did not show that some person received a majority of the votes cast in the election.

It is well at this point to decide definitely whether, in publishing the returns and announcing the result, the members of the General Assembly acted in a capacity of higher or lower dignity and responsibility than is commonly possessed by other persons, officials, or boards designated by the law or Constitution as canvassers of state elections returns. To our minds there is no escape from the conclusion that in publishing the returns and declaring the results the members of the General Assembly were performing a strict and precise duty identical in character with that which rests upon any and all persons who are merely authorized to canvass. They were not, while performing that duty, exercising or authorized to exercise any discretion, but were simply performing the ministerial act of disclosing to the public the official election returns that had been prepared by the election managers. By using the simple mathematical process of adding the number of votes appearing thereon for the persons named and seeing whether

any person named therein had a majority, they could know whether any person was elected, and, if so, it was their duty to declare that such person had been duly elected Governor. This canvassing of the returns and declaration of the result were constitutional directives to the General Assembly, and its failure to observe them ought not to defeat the right of the person elected or the franchise of the voters who elected him. This court clearly indicated in *Wood* v. *Arnall*, 189 *Ga.* 362 (6 S. E. 2d, 722), that the will of the people could not be thus defeated. The question in that case was whether the June general election, as provided for by' the act of 1937 (Ga. L. 1937, p. 712), was intended by the act to apply to the office of attorney-general. It was held that the regular method of electing an attorney-general would include ascertainment and declaration of the result by the General Assembly as provided by the Constitution for election of Governor, and that since the statute relating to such June election did not provide for election of attorney-general according to such regular method, it should be construed as not applying to that office. It was not held that the General Assembly had any power or discretion to vary the result as shown by the election returns, but on the contrary the following was stated, page 371: "The question here involved is not whether an official regularly elected by the people at the time and place prescribed by law could be deprived of his office by virtue of the mere failure of the General Assembly to canvass and declare the result as directed by the Constitution, for manifestly the will of the people could not be thus defeated."

The General Assembly, as canvassers of the election returns in this case, were subject to the general, if not indeed the universal, rule of law applicable to election canvassers. That rule is that they are given no discretionary power except to determine if the returns are in proper form and executed by the proper officials and to pronounce the mathematical result, unless additional authority is expressed. They can neither receive nor consider any extraneous information or evidence, but must look only to the contents of the election returns. 29 C. J. S. 236, 237; 18 Am. Jur. 347; People ex rel. Sherwood *v.* Board of Canvassers, 129 N. Y. 360 (29 N. E. 345, 14 L. R. A. 646) ; *Davis* v. *Warde,* 155 *Ga.* 748 (118 S. E. 378) ; *Bacon* v. *Black,* 162 *Ga.* 222 (133 S. E. 251). In *Davis* v. *Warde,* supra, this court quoted with approval from 20 C. J. 202,

§ 258, as follows: "It is settled beyond controversy that canvassers can not go behind the returns. The returns provided for by law are the sole and exclusive evidence from which a canvassing board, or official, can ascertain and declare the result. The canvassers are not authorized to examine or consider papers or documents which are transmitted to them with the returns, or as returns, but which under the statutes do not constitute part of the returns. Neither are they at liberty to receive and consider extrinsic evidence, unless the official returns are destroyed before they are canvassed, in which case secondary evidence of their contents may be received." In *Bacon* v. *Black*, supra, this court said: "In declaring the result of the election the consolidation managers are governed by the returns made by the superintendents of the several local precincts as to the number of votes cast, and for whom cast; and if these returns be in due form, they have no power to go behind them. . . Their duty is simply to count the votes of the several precincts as the same are shown in the certified returns, and declare the result."

These authorities, which accord with the generally accepted rule, and we may say the universal rule so far as we are aware, show beyond reasonable doubt that the General Assembly, as canvassers, went beyond any authority conferred upon them, and hence, outside their legal jurisdiction, when they gave consideration to and made a finding of fact that the majority candidate had died after the election of November 5, 1946. It necessarily follows that all such action beyond the jurisdiction of the General Assembly was null and void and must be disregarded entirely.

It has been urged by counsel for Mr. Talmadge that two reasons why the General Assembly, in making such a canvass and announcing the result, were more than mere canvassers are (1) that the Constitution, art. 5, sec. 1, par. 5, confers power upon the General Assembly to determine contested elections "in such manner as shall be prescribed by law" and (2) that since the Governor has no commission it is necessary to publicly recognize and authoritatively announce his election. We can not accept this argument as being tenable. The first reason is unsound because the matter of determining a contest is wholly independent of and apart from the canvassing of returns, which is merely consolidating the election returns and declaring the result. In this case there was no contest whatever, and the General Assembly had no right to exercise their

power to determine contests in the performance of an entirely different duty as canvassers. The second reason is completely answered by the fact that the Secretary of State, the Attorney-General, the State School Superintendent, the Comptroller General, the State Treasurer, the Commissioner of Agriculture, and the Commissioner of Labor receive commissions evidencing their election and title to their respective offices, and yet the Constitution, art. 5, sec. 2, par. 1, declares that all of these officers shall be elected at the same time and in the same manner as the Governor, and that "The provisions of the Constitution as to the transmission of the returns of the election, counting the votes, declaring the results, deciding when there is no election, and when there is a contested election, applicable to the election of Governor, shall apply to the election of the above-named executive officers; they shall be commissioned by the Governor and hold their offices for the same time as the Governor." This demonstrates that the act of canvassing the returns and announcing the result is not designed for the purposes argued by counsel. The election of the officers last referred to is conducted in the same manner as that for Governor. As evidence of their election and title to the office, they are given a commission by the Governor. This evidence in behalf of the Governor is his public inauguration.

This case might be decided without giving consideration to the authority and function of the General Assembly in publishing the returns and announcing the result, since the resolution adopted by that body clearly shows that it made no statement to the effect that the election returns show that no person received a majority of the votes, which fact, as will be pointed out later, is an indispensable condition precedent to its power to elect a Governor. However, we think that either the constitutional limitation on its powers as to publishing the returns, or the inability to show that in fact no one received a majority of the votes in the general election, would constitute a sufficient or valid reason why the General Assembly acted without authority and without power. Together they constitute an insuperable barrier to the exercise of such power.

In this State all power and sovereignty repose in the people. The departments of the State government have and can exercise only such power as the people have conferred upon them by the Constitution. Art. 1, sec. 1, par. 1. More than 120 years ago the peo-

ple of this State recaptured for themselves the general power to elect a Governor. By an amendment to the Constitution of 1798, adopted in 1824, art. 2, sec. 2, which conferred upon the General Assembly the power to elect a Governor, was expressly repealed, and in lieu thereof a new section reserving the power of electing a Governor in the people was adopted. That amendment, without material change, has been retained as a part of every subsequent Constitution, and is now found in the Constitution of 1945 as art. 5, sec. 1, quoted supra. That portion of the provision over which the present litigation arose is paragraph 4, which is as follows: "The members of each branch of the General Assembly shall convene in the Representative Hall, and the President of the Senate and Speaker of the House of Representatives shall open and publish the returns in the presence and under the direction of the General Assembly; and the person having the majority of the whole number of votes, shall be declared duly elected Governor of this State; but if no person shall have such majority, then from the two persons having the highest number of votes, who shall be in life, and shall not decline an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce; and in all cases of election of a Governor by the General Assembly, a majority of the members present shall be necessary to a choice."

By the terms of the Constitution, full and complete power to elect a Governor is reserved to the people, but if the voters fail to elect because they do not cast a majority of their votes for one person, then and then only is the power given to the legislature to elect a Governor.

From what has been said it is evident that the *general* power or jurisdiction to elect a Governor remains in the people under the present Constitution, and that as related to the election of such an officer by the General Assembly that body is an agency or tribunal of special or limited jurisdiction. As to courts, it is a well-settled principle that every presumption will be indulged in favor of judgments of a court of general jurisdiction, but that a judgment of a court of special or limited jurisdiction must show upon its face such facts as are necessary to give the court rendering such judgment jurisdiction of the person and the subject-matter, otherwise the whole proceeding is coram non judice and void. *Gray* v.

*McNeal,* 12 *Ga.* 424; *Franklin County* v. *Crow,* 128 *Ga.* 458 (3) (57 S. E. 784). Like principles are applicable to the General Assembly, so that in electing a Governor it would necessarily act as an agency or body of *special and limited* jurisdiction, and the facts essential to the existence of its jurisdiction in such matter should affirmatively appear. *Aultman* v. *Hodge,* 150 *Ga.* 370 (1), 374 (104 S. E. 1).

Much has been said by counsel on both sides regarding the word "person" and other words and phrases as they appear in the provision under consideration. The contentions urged by counsel for Mr. Talmadge, if sustained, would have the effect of isolating a few words from the entire paragraph and giving to them a refined definition without due consideration of the context in which they are used. This, under all the recognized rules of construction, can not be done. The true meaning of such words can be ascertained in no other way except by a consideration, *inter alia,* of the subject-matter to which they relate as disclosed by the entire paragraph. Of course, the words "person having" standing alone and independent of the subject-matter would indicate a person alive at the time of his *having,* and the words "if no person shall have," considered in the same manner, would indicate the present tense as of the time the returns are canvassed, but when these words are considered, as they must be, in connection with and as a part of the entire paragraph, which discloses the plan for publication of the returns and declaring the results as to elections to be held in the future, but which will already have occurred at the time of such publication and declaration, it is very apparent that they refer to elections by the people that have already taken place at the time of such prescribed action by the General Assembly. It is equally plain that all mention of a person who received votes refers only to such past election by the people and to the person who receives the votes at that time. We can not insert by implication the phrase "who shall be in life" immediately following the word "person" as it appears in this paragraph twice before the word "person," which is followed by that phrase. United States *v.* Atchison, T. & S. F. Ry. Co., 220 U. S. 37 (31 Sup. Ct. 362, 55 L. ed. 361); 50 Am. Jur. 274, § 262. When thus construed, the word "person," as used in the first two clauses refers to a living person as of the time of the election by the people, and his subsequent death is immate-

rial, so far as any power of election by the General Assembly is concerned. By the subsequent use of the words "who shall be in life," the Constitution marks the first and only time when the General Assembly shall take note of or consider the fact that a person voted for at the election by the people might have subsequently died. The reason for this is obvious. At this point, the General Assembly is not concerned with the election returns further than to ascertain whether there are any two persons from whom it may effectually elect a Governor within the terms of the Constitution, but it is now concerned with the performance of such constitutional duty, that is, in a case where no person received a majority of the votes, and it is here informed by the Constitution that although a person might be one of two who received the highest number of votes, it should not be required to do the perfectly futile thing of electing as Governor one who is not still in life. Hence, it would thus finally become material for the General Assembly to ascertain the two persons (if there be such) having the highest number of votes "who shall be in life."

Much argument has been offered to the effect that since Eugene Talmadge died before his election was declared, it would have been futile for the General Assembly to declare that he had been duly elected Governor since it would have been impossible for him to assume the duties of that office. We will not here depart from the central, controlling question for the purpose of discussing whether or not the General Assembly should have followed the direction of the Constitution and declared that the man who was elected Governor but later died had been duly elected Governor of this State, but some reference to that question will be made later. If on publication of the returns it is disclosed that the voters have cast a majority of their votes for some person for Governor, the Constitution means that such person has been duly elected Governor of this State and directs the General Assembly to so declare. When this has been done the question is closed, so far as any present election is concerned. The constitutional provision for conferring *conditional and limited* power upon the General Assembly to elect a Governor remains dormant, does not come into operation, and can not become effective. "If no person shall have such majority," then and in no other event, "from the two persons having the highest number of votes, who shall be in life, and shall not

decline an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce." Thus the General Assembly was limited not only to a specified event, but also to the two persons receiving the highest number of votes, who were still in life. If it had not been the very definite and clear intention that in every case the matter of electing a Governor must be as completely as possible governed by the expressed choice of the people, would it be reasonable to limit and restrict the General Assembly specifically to a choice between the two persons who receive the greatest number of votes, who are still in life? Is such manifest purpose to effectuate the will of the people reconcilable with the election by the General Assembly of one of two persons who receive some small number of votes, while the voters gave an overwhelming majority to another person who was in life on the date of the election?

Referring again to the meaning of the word "person," it may not be amiss to observe that just because this word may be defined in dictionaries as a living human being does not necessarily mean that it should be so construed in the foregoing provision of the Constitution or any other document or instrument. Everyone concedes that there was a living person who received a majority of the votes cast in the election of November 5, 1946. If the word "person" in the foregoing provision must be construed in all instances to mean a living human being, then it was pure surplusage to interpolate the phrase "who shall be in life" as a part of the clause referring to "the two persons" having the highest number of votes. If it was necessary to insert these words in this part of the provision in order to make the intention of the framers of the Constitution absolutely clear, then why was it not used in the preceding clause referring to the person receiving a majority? The answer is that the phrase was not intended to be even implied in the preceding clause.

There are two settled rules of construction that are applicable. One is that where a qualifying word or phrase is found in one provision and not in some other provision, the presumption is that the other provision was not intended to have such qualification. This seems to be universally recognized as a sound rule of construction. The other rule is that qualifying words are presumed to apply to the immediate antecedent and not to apply to a remote

antecedent, where they are omitted from the latter. Both rules, of course, are subject to the general rule that instruments must be considered as a whole, and there are doubtless other qualifications and variations, but it seems to us that both rules are applicable here. See, in this connection: 50 Am. Jur. pp. 257-261, §§ 267, 269, 271, 274; 69 C. J. 985, § 583. The clause "the person having a majority of the whole number of votes shall be declared duly elected Governor," is not absurd as applied to the present situation. Its true meaning is, that the General Assembly shall declare such person *to have been* duly elected Governor. That is what it means under any and all circumstances, for it refers always to a past fact.

Moreover, we are authorized, if indeed not required, to give consideration to the history of elections for Governor over a period of approximately half a century before the drafting and submission of the present Constitution, and its ratification by the voters in 1945. Throughout that period there had been one and only one dominant political party in this State. That party was and is the Democratic party. Every Governor throughout that period was a Democrat, nominated by the Democrats of Georgia in a Democratic primary, after a campaign in which vital issues were discussed throughout the State and embodied in a platform of principles upon which he sought nomination. The only opposition in the general election that any Democratic nominee had ever encountered throughout such period was an "Independent," or a member of some minor opposing party, and some write-in votes for persons who were not candidates. Such opposition candidates were not only opposing the choice of the Democrats of Georgia, but were opposing the platform of principles upon which he had been nominated. It could not, therefore, in reason be asserted that any person, whether a member of the Constitutional Commission, a member of the General Assembly, or a voter who had a part in the adoption of the present Constitution, desired or intended that in the event the person nominated by the Democratic party as a candidate for Governor, and overwhelmingly elected in the general election, should thereafter die before the result is declared, the General Assembly must thereupon under language of the Constitution, ignore all qualified Democrats of the State and limit themselves to a choice between two persons for whom votes were cast in opposition to the Democratic nominee for Governor. To attribute

such an intention to the great hosts of Georgians who had a part in adopting the Constitution when the language they employed does not imperatively demand it would be unreasonable, if not unthinkable. It would mean that they were willing and intended that all concern about the qualifications of the chief executive and principles for which he should stand may be wholly disregarded and abandoned. This conclusion is inescapable if it be admitted that a person who did not appear before the people, or who was a member of some minor opposing political party, or whose name had been written in, should be elevated to the high office of Governor, to the exclusion of all other Georgians eminently qualified to occupy that exalted office.

There are still other rules of interpretation that have been established by experience and which we think should be applied in this instance. In 11 Am. Jur. 684, § 67, it is said: "Framers of a new Constitution who adopt provisions contained in a former Constitution, to which a certain construction has been given, are presumed as a general rule to have intended that these provisions should have the meaning attributed to them under the earlier instrument. The embodiment in a Constitution, without change of verbiage, of provisions found in previous constitutions, precludes the court from giving their language a meaning different from that ascribed to the previous constitutional provisions, notwithstanding the construction referred to is that placed on the old Constitution by the legislature and not by the judicial department of government." It may be that the rule just quoted is stated more strongly than we would be willing to put it. It is unnecessary to go that far here. We would prefer to say that the meaning placed upon the language by such legislative construction will be presumed to have been the meaning intended by those who adopted a constitution, rather than that, as the quoted rule states, the courts are precluded by such construction. The rule is perhaps more correctly stated in 16 C. J. S. 76, § 35, as follows: "It is an established rule of construction that, where a constitutional provision has received a settled judicial construction, and is afterwards incorporated into a new or revised constitution, or amendment, it will be presumed to have been retained with a knowledge of the previous construction, and courts will feel bound to adhere to it. Prior legislative construction is likewise, presumed to have been adopted by subse-

quent adoption of the provision so construed. The language of an existing statute adopted into a constitution is presumed to bě taken with its established construction."

What was the situation confronting the drafters of this Constitution as related to legislative interpretation of the language here employed? The provision of the Constitution, as stated above, was made a part of the Constitution of 1798 by amendment, and has constituted a part of every Constitution since that time. It was, without change in any respect, written into the present Constitution exactly as it appeared in the Constitution of 1877. There had at no time been a judicial construction of this language, but there had been legislative interpretation which, under either of the above rules, presumably shows the meaning intended by the framers of the present Constitution. By an act approved November 22, 1871 (Ga. L. 1871, p. 27), providing for a special election for Governor, it was required that the election be held in the same manner, and the returns published and the result declared, as provided in the Constitution. Section 4 of the act declared that "if no person be found to have received a majority of the whole number of votes cast at said election, then from the two persons having the highest number of votes, who shall be in life, and shall not decline an election," the legislature shall elect a Governor. We repeat, for emphasis, the words, "if no person be found to have received a majority of the whole number of votes cast at said election," since it unmistakably refers to the date of the election. Under the rule above cited, the framers of the Constitution of 1877 presumably intended that its language, "if no person shall have such majority," which was taken from the Constitution in force on the date of the above legislative enactment, meant precisely what the legislative construction had said it meant. After the adoption of that Constitution, by an act of July 22, 1879 (Ga. L. 1878-79, p. 173), now Code, § 40-102, which provided for an election to fill a vacancy in the office of Governor, it was provided that the General Assembly should canvass the returns of such special election and declare the result, or elect a Governor "in case no person shall receive a majority of the whole number of votes cast at such special election." Thus it appears that the language in the present Constitution about which this controversy arose had its meaning declared by legislative construction prior to its incorporation in the

·Constitution of 1877. Also, the meaning as thus stated was given to the same language as it appeared in the Constitution of 1877, by a subsequent act of the legislature construing the same; hence, when it was lifted from that Constitution and inserted in the present Constitution, presumably it was intended to have the same meaning.

In *Massenburg* v. *Commissioners,* 96 *Ga.* 614, 617 (23 S. E. 998), this court said: "Where the Constitution prescribes the manner in which a particular public functionary is to be elected, or prescribes the terms during which he shall hold office, the legislature is thereafter powerless to modify, enlarge or diminish that which is established by the Constitution. . . If, therefore, the people in their sovereign capacity, in convention assembled, do by the terms of an organic law, established by them and for them, · reserve unto themselves the right of election to particular offices, . the legislature can not thereafter interfere with this reserved right, and provide other means than those established by the Constitution for the election of incumbents to such offices, even though there be no negation of this right of legislative interference expressly stated in the terms of the Constitution. The reservation of the right itself is a sufficient safeguard against the encroachments of legislative power, inasmuch as such reservation of itself operates as a denial to the legislature of the right of interference." There this court was announcing a fundamental principle of our State government under the Constitution. A departure from that high principle might well endanger the stability of the entire governmental structure. It declares a rule of law that denies any implied or inherent right or power in the legislative department to exercise any power that has not by the sovereign people, through that Constitution, been reposed in the legislative department of government. At the very point where any department of the State government fails to recognize the truth asserted in the first paragraph of the Constitution, to the effect that in this. State the people are the masters and the officials the servants, liberty is imperiled. Since the duty and the responsibility to construe the Constitution has by the people been laid upon the judicial department in cases involving the rights of litigants, the constitutional limitation upon the power of each coordinate branch of the government must be adjudicated by the courts in cases calling that matter in question.

Until such an adjudication has been made, neither the legislative nor the executive department may be presumed to have intended to exceed its power, but they should welcome and willingly abide by the limitation when fixed by an adjudication. This court spoke again in *Morris* v. *Glover,* 121 *Ga.* 751, 754 (49 S. E. 786), as follows: "In those governments where the lawmaking power is not fettered by a written constitution limiting its authority, offices may be created, consolidated, or abolished, at legislative will. . . But where an office is created or guarded by express constitutional provision, its scope can not be enlarged or lessened by statute, *nor can the office be filled in any manner other than that prescribed by the constitution."* (Italics ours.)

It would not necessarily cause a governmental breakdown, if, at the time fixed for the election of a Governor, no one was chosen Governor. The constitutional arrangement, while not sufficient to insure that there could not possibly occur a vacancy in that office, nevertheless makes reasonably sure that it shall be lawfully occupied at all times. Paragraph 1 of art. 5, sec. 1, fixes the term of the office of Governor at four years and until his successor shall be chosen and qualified. The phrase "until his successor shall be chosen and qualified," has a recognized and definite meaning, as declared by numerous decisions of this court. *Shackelford* v. *West,* 138 *Ga.* 159 (74 S. E. 1079); *Pittman* v. *Ingram,* 184 *Ga.* 255 (190 S. E. 794); *Roan* v. *Rogers,* 201 *Ga.* 696 (40 S. E. 2d, 554). That time in excess of the four-year period which a Governor may be required to serve is a part of his constitutional term. His installation in office is for a term embracing, not only the four years mentioned, but such additional time as may be required for his successor to be chosen and qualified. The further provision rendering him ineligible to succeed himself has no bearing whatever upon the duration of his term. Its primary object is to prevent the necessity of the Governor engaging in a political campaign during his term. Certainly it is not for this court to fix the policy and the law about choosing a Governor. We merely construe the law which the people have adopted. A construction of the Constitution that would sustain the election of Mr. Talmadge by the legislature would place a controlling meaning upon the pertinent portion of the Constitution, which might compel some future General Assembly to elect as Governor a person wholly undesirable, because of his communis-

tic or other alien philosophies of government, in any case where the majority candidate died before the returns were published by the legislature and where two of such undesirable persons received the next highest number of votes. It would not constitute a worthy solution of the stated hypothetical case to suggest that the General Assembly in such a case may simply make no election. Those members are under the solemnity of an oath, obligating them to obey the Constitution. In a case where the Constitution authorizes the General Assembly to elect a Governor, it declares that if the condition precedent exists "the General Assembly *shall* immediately elect a Governor viva voce." (Italics ours.) Such a construction as that above mentioned would mean that the General Assembly when acting as canvassers of the election returns, are supreme, and their action is not subject to review. To thus hold would mean that had Mr. Eugene Talmadge been living, and despite the knowledge of everyone of his overwhelming election, the canvassers of those election returns could with immunity and finality assert that some other person was elected, and the people's right, together with the right of Eugene Talmadge to have his election recognized, could be thus destroyed, leaving them without any recourse whatever. This hypothetical case may never arise, and indeed we are all hopeful that it will never arise, but it is within the realm of future possibility and can not be ignored or overlooked when a construction of the Constitution is being made by a court.

From what has been said we must hold that in the circumstances appearing the General Assembly had no jurisdiction to elect the Honorable Herman Talmadge or any other person as Governor.

Under the Constitution, art. 5, sec. 1, par. 1, above cited, Governor Arnall was authorized to occupy the office of Governor until his successor was chosen and qualified. A successor was chosen, but his death prevented him from qualifying at the time fixed by law, thus creating the necessity for Governor Arnall to continue in office. But Mr. Thompson was elected in the general election in 1946 as Lieutenant Governor of this State, and he is required, in case of a vacancy in the office of Governor, to perform the duties of Governor. Constitution, art. 5, sec. 1, par. 7. The voluntary resignation of Governor Arnall on January 18, 1947, immediately imposed upon the Lieutenant Governor the duties of Governor.

He is now entitled to perform all of the duties and exercise all the authority which by the Constitution and laws are imposed upon the Governor of this State.

For the foregoing reasons the judgment is affirmed in Case No. 15792, *Byars et al.* v. *Thompson,* and reversed in Case No. 15797, *Thompson, Lieutenant Governor, et al.* v. *Talmadge.* In Case No. 15798, *Fulton National Bank of Atlanta* v. *Talmadge et al.,* the bank, as holder of a large sum of money belonging to the State, sought to require Mr. Thompson and Mr. Talmadge to interplead and show which of them was entitled to recognition as chief executive of the State. It also involved the uncertainty of questions of law and fact, and the allegations were sufficient to justify the interpleader, and the court erred in sustaining a general demurrer to the petition. Accordingly, that judgment is reversed. Since the petition for interpleader was thus not subject to demurrer, the court did not err in overruling the demurrer thereto of Mr. Thompson. Accordingly, the judgment is affirmed as to the cross-bill, Case No. 15802.

*All the Justices concur, except Jenkins, C. J., and Candler, J., who dissent.*

JENKINS, Chief Justice, dissenting. The determination of the controlling legal question involved in these cases is a matter of great public concern, gravity, and importance. Laws and constitutions in a government of law as distinguished from an autocracy are not decreed and administered to fit some special occasion after *it has happened;* but being fashioned in advance to meet all future contingencies, they are more like ready made garments, and for this very reason do not always by specific, as distinguished from general, language fit unusual future contingencies as perfectly as we can afterwards see that they might possibly have been made to do. But there are few indeed in all this land who would exchange their liberty under a government of law for any other system where rights and liberties, if any, are doled out as a matter of grace from some malevolent or even benevolent autocrat.

I would much prefer, if it were possible to do so in a case of such great importance, to join in the majority opinion of my learned colleagues rather than dissent from the conclusions of law at which they have arrived. However, having resolved the questions as best I could, and having reached a decided conviction con-

trary to that expressed by the majority, with due modesty I trust as one of two dissenters, and with all deference to my majority brethren, I feel it incumbent upon me to state for the record, as briefly as I can but as fully as is necessary, the reasons which have impelled me to arrive at a different legal conclusion. While it is true that the majority opinion is the judgment of the court and therefore becomes the law of the land, it is also true that in the development of American jurisprudence the dissenting opinion is believed to have ofttimes played a useful part.

■ *The Lieutenant Governor can not claim, nor does he in fact seek to claim under or by virtue of the death of Hon. Eugene Talmadge, but as conceded by his counsel of record and as shown by his pleadings, he bases his claim solely by virtue of the resignation in his favor of the incumbent Governor. The incumbent Governor, on account of the election having failed, was legally holding over after his regular term had expired until, but only until, his successor could be legally chosen.*

The Lieutenant Governor, thus claiming under and by virtue of the holdover Governor's resignation in his favor, and having by his pleading in fact asked to be made a party to the suit originally instituted by the incumbent Governor holding over, does not, therefore, even claim to stand in the shoes of the late Hon. Eugene Talmadge; but, claiming as he does under the resignation of the holdover Governor, puts himself squarely in *his* shoes, and not only manifestly can not but does not even seek to assert any claim to the office other than that which the resignation of the holdover Governor might give him. Unquestionably, when the election by the people failed, the incumbent Governor was constitutionally authorized to hold over beyond his regular term and for the next four years until the next election as provided for by the Constitution, unless it be that the Constitution, after disqualifying any incumbent Governor to succeed himself, goes further to provide for the termination of his holdover tenure by making provision for a special intermediate election by the General Assembly under such a contingency.

It is quite impossible, however, to so completely close one's eyes and ears as to be wholly unaware of the troubled state of mind of many of the citizens of this State, who appear to reason that, since on the same ticket at the last general election in November there

appeared the name of a successful candidate for Governor, and of a successful candidate for Lieutenant Governor, the death of the former, although he did not become Governor, left the latter to succeed him. While this is not the contention of Mr. Thompson or his attorneys of record, since it is suggested and insisted upon by some of the briefs filed in his behalf by attorneys, *amici curiæ,* it is thought proper to refer to it. This too is the idea that has actually troubled me more than anything else—not as a matter of law, but because at first blush it might seem that way. It is doubtless true that to many the question presented is just that simple and just that plain. It would indeed have been so if the Constitution had declared, as it could have done, that, upon the failure of an election by the people by reason of the death of the successful candidate before being installed, the Lieutenant Governor would take over, and had it not on the contrary provided otherwise, that is, that under such circumstances the incumbent Governor and not the Lieutenant Governor shall hold over until a Governor can be chosen and qualified. A provision for the succession of the Vice President when the successful candidate for President shall die before taking office is contained in the Federal Constitution. The Georgia Constitution, however, not only fails thus to declare, not only does it limit the right of the Lieutenant Governor to succeed to the duties of Governor upon "the death, resignation, or disability of the *Governor,"* not only does it preclude his right to do so by declaring that upon the failure of an election it is the incumbent Governor, not the Lieutenant Governor, who shall hold over "until his successor is chosen and qualified," but to make assurance doubly sure, the Constitution after prohibiting any Governor to succeed himself, although providing that he should hold over until his successor is chosen and qualified, goes on to expressly limit his holdover tenure by providing for a special election for Governor by the General Assembly when it shall appear when the returns are canvassed that the election has failed in that no person shall then have a majority of the votes cast. It is thus easy enough to see why it is that the Lieutenant Governor bases his claim, not by reason of the death of the successful candidate, but wholly under and by virtue of the resignation in his favor of the incumbent Governor holding over.

Courts must construe the provision of the Constitution creating

the office of Lieutenant Governor as it is written and not as it might have been framed. We are dealing not with "subjunctives," that is, not as to what our Constitution "may, can, must, might, could, would, or should" contain, but only with that which it actually does contain. To do so is not resorting to technicalities. No layman, I am sure, much less a judge, would for one moment believe that it is the duty of courts to Gallup Poll their own minds in order to determine what they think the people think the Constitution *ought* to have contained. The office of Lieutenant Governor is indeed an exalted one, but since the right of the Lieutenant Governor to take over the duties of Governor has thus been positively limited by the Constitution creating the office in the three different ways which have been indicated to the one contingency set forth, he who takes the office takes only such office as the Constitution gives him, and it is not for courts by taking thought to add one cubit to its stature.

■ *The cases before us in my opinion present justiciable controversies which it was and is the duty of the courts to adjudicate. Since the year 1824 the Constitution has provided for the election of a Governor by the people; save and except under the one contingency set forth by article V, section I, paragraph IV, in which case the General Assembly is given the duty and authority to elect. The Constitution further declares that under such a contingency, that is, when the election by the people shall prove ineffective, the incumbent Governor shall hold over until his successor is chosen. There is therefore no inherent political right in the General Assembly to elect a Governor. The Constitution has by its terms sought to cover the whole ground. Such power as the General Assembly has to elect a Governor must therefore rest solely under and by virtue of the authority conferred in the paragraph of the Constitution which has been mentioned and in the light of the other provisions just referred to. It is not merely a question of whether the General Assembly has properly exercised a political authority given to it in the election of a Governor; but the question is presented as to whether under the provisions of the Constitution and under the undisputed facts, it had the constitutional authority to declare that the election by the people had become ineffective, with the resulting right on its part to elect a Governor and thus terminate the constitutional tenure of the holdover Gov-*

*ernor. Since, under the admitted facts, the language of the Constitution is not wholly free from ambiguity as to the power of the General Assembly thus to act, it becomes the duty of courts when called upon to determine that question.*

No one seems to question the universally recognized doctrine that courts have nothing to do with purely political matters. This principle has been recognized by the courts and has been reiterated from time immemorial. *Beall* v. *Beall,* 8 *Ga.* 210. It is a principle which is conceded by all counsel in this case. But, as I see it, these cases before us involve not merely the manner, form, or the proper *exercise* of an undoubted political authority, but a constitutional question is made as to whether the General Assembly under the Constitution was authorized to exercise such authority at all. It is thus my view that, while the legislature, together with the executive branch of government, has exclusive authority in the exercise of all purely political functions except as may be *prohibited* by the Constitution, it seems clear that, should it erroneously construe the Constitution as giving it authority to act in a matter, even though political in character, in which the Constitution by otherwise providing has prohibited it to act at all, it is the duty of courts when called upon so to declare.

It thus seems that the numerous cases cited by counsel for Mr. Talmadge, in support of the contention that the courts are without jurisdiction to adjudicate the constitutional authority of the General Assembly to elect a Governor under the circumstances presented, are not controlling. As I see it, these cases almost without exception go only to hold that the legislative and executive branches of government have exclusive authority in the *exercise* of an *actual* political power and authority. It is true enough that in such acts the courts must not presume to interfere. This is far from meaning, however, that courts are entitled to claim exemption from an unpleasant duty and to stand aside when the question is whether the General Assembly under the facts presented had authority to act at all. As I see it article V, section I, paragraph I of the Constitution, providing for an election for Governor by the people every four years, and the provision that authorizes the incumbent to hold over until his successor is chosen and qualified, do actually thus prohibit any intervening election by the General Assembly, unless it be that article V, section I, paragraph IV,

provides for a termination of such holdover tenure when an election by the people fails, by setting up a special election by the General Assembly. If it were unambiguously plain, or if the courts should hold, that under the admitted facts the General Assembly under the paragraph last mentioned did have authority when the returns were canvassed to declare that no "person" did then "have" a majority of the votes cast (as I think it did have), it would necessarily follow that it would become the right and duty of the General Assembly to proceed in the exercise of its political function to elect a Governor, and that in the exercise of such function courts would have no authority to interfere, since it would be no concern of courts as to how or in what manner it exercised such exclusive political authority. But authority must be had before it can be exercised. This is true even as to political authority, when the question is whether the Constitution confers or whether it prohibits its exercise. Viewing the different provisions of the Constitution together, the question before this court is whether, under the undisputed facts presented, the Constitution gave or whether it forbade the General Assembly to make such an adjudication as to the failure of the election and, as a consequence of its declaration, thereafter to proceed to elect a Governor. This is what gives jurisdiction to the courts. To my own mind, but contrary to the opinion expressed by my brethren, it is absolutely clear that, if no person had ever received a majority of the votes cast, it would have become the plain duty of the General Assembly so to declare, and that it is by virtue of such adjudication that the duty would thereupon devolve upon the General Assembly to elect a Governor. It is only because the language of the Constitution does not in just so many words provide for the particular contingency presented that any construction of the Constitution relative to the rights and powers of the General Assembly is required. The fact that the General Assembly, as I see it, did in point of fact have all of such authority, is beside the mark with respect to the proposition now being dealt with.

■ *The Constitution by article V, section I, paragraph IV, delegates to the General Assembly the exclusive duty and authority to canvass the returns. This, as I understand, is not questioned by any one.*

This paragraph of the Constitution is in my opinion decisive

as to that and other features of the case, but since it has been quoted in full in the majority opinion it will not be repeated here. Since, as stated, it not only seems manifest, but no one seems to question that the duty and responsibility of canvassing the returns is placed solely upon the General Assembly, and that such action on their part is altogether conclusive, there is no need to give further consideration to this admittedly unambiguous phase of the case.

■ *Not only is authority clearly delegated to the General Assembly to canvass the votes; but to me it seems just as palpably clear that it is also made their duty to designate, that is adjudicate, the "person" "having" a majority of the votes cast, if any there be, and thus qualify him to take the oath of office.*

This proposition seems disputed by counsel for Mr. Thompson, inasmuch as they contend that the General Assembly acts only in a ministerial capacity in canvassing the returns and publishing the result. However, the very language of the Constitution says that the person so entitled "shall be declared duly elected Governor." This court by a unanimous bench has said that this function of the General Assembly constitutes an integral part of the election itself. *Wood* v. *Arnall,* 189 *Ga.* 362, 368 (supra). *Someone* ought to be empowered not only to publish the result of the figures, but to adjudicate authoritatively what it is that these figures mean, and who it is that has been "duly elected Governor." The Governor unlike other officers receives no commission. The Constitution in lieu thereof has very wisely committed to the General Assembly complete control of the election process. The Constitution provides that "the Governor-elect" (manifestly after being so declared) *"shall be installed in office at the next session of the General Assembly."* It provides that the returns shall be opened and published by the President of the Senate and Speaker of the House *"in the presence and under the direction of the General Assembly,"* when the "person" "having" a majority of the votes cast shall be *"declared duly elected Governor of this State."* The Constitution further provides the oath to be administered, which by statutory law perfectly consistent with the Constitution (Code, § 40-104) "shall be taken by the Governor-elect in the presence of the General Assembly." All this constitutes the sole evidence of his right to execute the executive power. It is not left for just anyone

who might have the temerity to do so to seek to exercise the functions of the office. He must carry with him the authoritative credentials of the General Assembly. It is thus my view that the Constitution does not constitute the General Assembly mere administrative clerks or "tellers" to tabulate and publish the figures of the election. It was made something more than a mere animated adding machine. The figures merely furnish the basis that is the evidence on which the *declaration* required of the General Assembly by the Constitution is based. Just as with most officers it is the commission, so here it is the declaration followed by the installation, both by the General Assembly, which enables one actually elected Governor to be recognized as such. While it was the Creator who embedded the granite within the mountain side which makes up the features of General Lee, it took the sculptor's hand to make it stand forth for men to recognize and acclaim.

■ *Under the Constitution, when the returns were canvassed it became the duty of the General Assembly to determine whether or not under the undisputed facts there was a person who did then have a majority of the votes cast, whom the General Assembly could properly designate as Governor-elect and thus qualify to appear before it and take the oath and be installed. Not only is the General Assembly entrusted with the duty of such a decision by the Constitution, but as I see it under the facts of this case, it correctly determined that the election by the people had in fact failed in that no "person" did then "have" a majority of the votes cast.*

Here it seems we arrive at a still sharper line of demarcation between the opposing sides. This seems to be the crux of the case, for should it be held that under the facts of this case the General Assembly had the exclusive right to declare, and had in fact determined, that the election had failed, in that no "person" did then "have" a majority of the votes cast, it would follow almost as a matter of course that it thereupon became the duty and function of the General Assembly to proceed to elect a Governor. While the proposition just stated seems clear enough to me, it does involve a construction of the Constitution, which is not absolutely unambiguous, and therefore, as I see it, presents the first of the two justiciable points of controversy.

If the General Assembly, after canvassing the returns and publishing the result, should fail to declare any person "duly elected

Governor," so as thus to qualify him to take the oath and be installed in office—should it fail to do this and stop right there, without going on to show *why* it had failed in its duty to do so by adjudicating the *absence* of any person whom it *could* qualify, there would seem to be a manifest dereliction of trust imposed upon it by the Constitution. The right of the General Assembly to determine when an election has failed and to declare that it has failed when such is the fact is not even a matter of necessary implication, for the language of the Constitution, not only provides that they shall declare who is elected Governor when there shall be a person who has a majority of the votes, but goes right on in the same connection to say what they shall do if no person shall have such a majority. It is conceded that under *some* circumstances they must proceed to elect a Governor. Would it not be an anomaly for them to do so without any determination as to why? To me, it does not seem possible to conceive that the General Assembly should be called upon to pass upon the *efficacy* of an election under one contingency, but not be called to pass upon the *failure* of an election upon the other contingency; especially so when it is given an alternative duty according to which contingency may actually exist. Not only does this paragraph of the Constitution thus speak for itself, but it has also been thus construed by another and different paragraph of the Constitution (article V, section II, paragraph I) dealing with other State House officials, which says in just so many words that the General Assembly is given the same duty in those cases of "deciding when there is no election" as is "applicable to the election of Governor." Moreover, it is well to stress here that it is by virtue of this same adjudication of the General Assembly that the election has failed that the incumbent Governor is authorized to constitutionally hold over beyond his regular term, and until his successor can be legally chosen. As already shown, it is only under and by virtue of such holdover tenure of the previous Governor, coupled with his resignation in favor of the Lieutenant Governor that the latter claims. If, as I see it, the Constitution has thus twice spoken for itself, and it seems that it has done so, not in specific terms but in a manner just about as plain as John Alden did ever speak for himself, the General Assembly has been given jurisdiction, not only to canvass the returns and publish the result of the ballots, not only to designate the Governor-elect, and

thus qualify him to take the oath of office where there be some person who has a majority of the votes cast; but it seems just about as certain and just about as plain from the language of the Constitution itself that, if and when the election fails and there be no "person" who shall "have" a majority whom it can declare to be Governor-elect and proceed to install as Governor, it becomes its duty to adjudicate that fact. That the responsibility imposed upon the General Assembly is not a mere clerical formality confined to figuring up the votes, especially when the votes have become wholly ineffective, is shown with great uniformity in the rulings made by the courts of last resort in our sister States. See Morris v. Bulkeley, 61 Conn. 287 (supra); Dickson v. Strickland, 114 Tex. 176 (supra); Carr v. Wilson, 32 W. Va. 419 (supra), and Taylor v. Beckham, 108 Ky. 278 (supra).

But it is urged and insisted by counsel for Mr. Thompson both in the written and oral arguments, that such can not be the proper interpretation of the decisive paragraph, not only for the reason that the duties of the General Assembly are purely clerical in character, but, as I construe the effect of the argument, it has power to act in a reminiscent way only. That is, they say that the language of the paragraph forbids the General Assembly to do aught else than uselessly to show that "once upon a time" there *was* a person who prior to his death, *had* a majority of the votes cast, and who therefore, if he had not died, would still "have" a majority. Their more specific argument is that the paragraph provides with reference to electing a Governor that, if no person shall have a majority, then the General Assembly shall elect from the two persons having the highest vote *who shall be in life;* whereas the preceding portion of the paragraph merely declares that the person having the highest number of votes shall be declared duly elected Governor without including the italicized words *who shall be in life.* It is thus urged that the framers did not intend to require the successful candidate to be in life when the time should come for the General Assembly to declare him duly elected Governor. In other words, we seem to be asked to construe the quoted paragraph to mean that, when the successful candidate dies before qualifying, it is nevertheless the duty of the General Assembly to solemnly declare him to be "Governor-elect." There would seem to be no more reason to try to declare a deceased person Governor-elect than

there would be to attempt to swear him in as Governor. The use of the words "who shall be in life" in one phrase and not in the other avails nothing. The provision in the Constitution is that the General Assembly shall declare the "person" "having" the majority vote as "duly elected Governor of this State." Why should the Constitution be expected to say that the person whom it shall name as Governor-elect so that it can install him in office should be in life? It *did* take the proper precaution of saying that, if and when the General Assembly came to elect a Governor itself, that deceased persons should not be counted in determining who had received the two highest votes from whom it was to elect. There is nothing strange about its language in either instance.

Before leaving this phase of the discussion, it might be proper to observe that from my viewpoint, that is, construing the Constitution as I have, to mean that the General Assembly did in fact have the delegated right and exclusive authority to declare whether or not under the circumstances existing in this case any person did then have a majority of the votes cast, the *execution* of that authority, that is, the determination of whether the election had or had not failed was a political function, of which the General Assembly was the sole arbiter. But in view of the holdings made by the majority opinion that it did not even have the power to say whether the elections had or had not failed, I will seek to show, not only that it had the exclusive right and duty to, declare whether or not the election had failed in that no one did then have a majority, but that its determination that it had failed was in fact correct, and therefore for that reason it had the right to elect. If I be right as to both or right as to either of these propositions, the action of the General Assembly should be sustained.

Passing on then from the proposition that the General Assembly was exclusively authorized under the only reasonable interpretation of the language of the Constitution to adjudicate under the facts of this case whether or not the election had failed in that no person did then have a majority of the votes cast, let consideration now be given to the question as to whether or not the General Assembly was correct in adjudicating that it had failed.

As I see this case, it does not hang solely upon the proper construction to be given to the word "person" and the word "have" when the Constitution says that the General Assembly shall proceed

to elect a Governor when no "person" shall "have" a majority of the votes cast. To me the proper meaning and purport of the Constitution, as shown by all of its provisions, is that the General Assembly shall elect a Governor when at the time the returns are canvassed there shall be no "person" who shall "have" a majority of the votes cast whom the General Assembly can declare "duly elected Governor of this State" and whom it can proceed to install in office. But it is also true that the use of the words "person" and "have" are most highly significant and about as strongly indicative as any two words could be.

In determining the meaning of the word "person" as used in the quoted paragraph of the Constitution, the fact that the successful candidate though dead when the votes were canvassed was in life when the votes were cast by the people is, as I see it, a matter of historical interest only. This for the reason that he died, not only before becoming Governor, but even before the election itself was completed by a canvass of the returns by the General Assembly. This being true, it seems impossible to see how, when the time arrived for the returns to be canvassed, it could reasonably be said that any "person" did then "have" a majority of the votes cast. As to the construction of laws, our Code, § 102-102 (1) lays it down as a fundamental rule of construction that, except as applied to words of art, etc., "The ordinary signification shall be applied to all words." Webster's New International Dictionary (2d edition) defines the word "person" as "A being characterized by conscious apprehension." It in no way treats the word as referring to one who had become deceased. Giving then to the word "person" as used in the quoted paragraph of the Constitution its usual and natural interpretation, there is no obscurity. In the work entitled Words and Phrases, vol. 32, page 204, in digesting a Wisconsin case with respect to a primary election law which provided that the *person* receiving the greatest number of votes at a primary should be declared the candidate of that party, the authors of the work mentioned quote that court as follows: "A dead man is not a 'person' within the statute; such word meaning a living human being," citing Bancroft *v.* Frear, 144 Wis. 79 (128 N. W. 1068, 140 Am. St. R. 992). See also Brooks *v.* Boston & N. St. Ry. Co., 211 Mass. 277 (97 N. E. 760), where the Massachusetts court makes the somewhat gruesome statement that "A corpse is not a person." It would seem needlessly

tedious and perhaps confusing to attempt too much analysis of this phrase of the paragraph in question. To seek to make that clear which is already clear can only lead to confusion. As someone once remarked, "The Scriptures often throw great light upon the commentaries." But before dismissing any further discussion as to whether in using the word "person" the Constitution really means a person whom the General Assembly could qualify to appear before it and take the oath of office, it might be helpful to briefly call attention to just one thing more. The paragraph says that the General Assembly shall elect when no "person" "shall have" a majority. Note the present tense of the words "shall have." What the Constitution actually says is therefore a far cry indeed from what it would have said had it been written that the General Assembly shall elect when no person shall have *and no deceased person ever did have a majority.* True enough that a person now deceased once had a majority of the votes, but his narrow cell of six feet of earth owns nothing now—rather be it said nothing akin to lands, goods, tenements, or offices.

■ *As I view the law as applied to the admitted facts, it was just as much the duty of the General Assembly, after correctly deciding, upon the returns being canvassed, that no "person" did then "have" a majority of the votes cast, to proceed to the election of a Governor as it would have been if no person had ever received such a majority.*

It is well to observe at the outset that the paragraph of the Constitution giving the General Assembly the right and duty to elect a Governor when the election by the people has thus failed, whether wise or unwise, antiquated or not, is not mere cast-up driftwood littering the shore line of today. It may in a way seem startling, but it can not be doubted, and is in fact conceded on all sides, that there are contingencies when this may be done. Until the year 1824 the sovereign people had expressly given to their General Assembly the entire duty and responsibility of electing a Governor. While in general the method of election has been changed, one small remnant of this ancient authority clearly adheres in our Constitution of today. It is true that the application of this paragraph of the Constitution to the particular state of facts actually presented requires construction, for the reason that it is not so palpably and transparently clear as it would have been had no person,

since deceased, ever received a majority of the votes cast; and it is true that it is only when the votes are canvassed and no "person" "shall have" a majority that the General Assembly is empowered to elect. But as already stated in discussing the preceding closely related phase of the case, the fact that there was a successful candidate who had received a majority of the votes cast, but who was dead when the General Assembly canvassed the returns, is a matter of historical interest only. If it be conceded, as I believe has been shown, that there was then no "person" who did then "have" a majority of the votes cast, the language of the Constitution seems explicit and direct that the General Assembly must proceed to elect, and this is true even though in doing so it may thus curtail the constitutionally extended tenure of the incumbent Governor who when an election fails holds over after his regular term has expired until, but only until his successor is chosen and qualified. Here again we get back to a fundamental principle of construction. Where the Constitution or constitutional statutes speak plainly, we must take them according to what they actually *say* and let them mean just that and nothing more. It is only when the *language* of the Constitution is in and of itself susceptible to two or more interpretations, each equally permissible, that courts are at liberty to consider the comparative reasonableness or unreasonableness of the two constructions in order to arrive at what must have been the true intent of such ambiguous language. *Standard Steel Works Co.* v. *Williams,* 155 *Ga.* 177, 181 (116 S. E. 636). Where it speaks for itself, that is the end of the matter. The rule is thus a mandatory one, even though a different interpretation from that *actually expressed* might seem to better meet future contingencies, and thus afford a safer general rule to serve the public welfare.

Much has been said about changed conditions since the language of the quoted paragraph of the Constitution was embedded within our organic law in the year 1824. It is true many things have come to pass since then, but what has all this to do with the language of the Constitution requiring the General Assembly to elect a Governor under a named contingency? Language has not changed. Dictionaries were in vogue then just as they are now. The language under discussion has five times been carried forward and five times solemnly embedded within our organic law. The last time that this was done was but as yesterday, after the horses

and buggies were mostly put away. There in clear cold print it stands, and there it should remain until the power that wrote it in shall write it out. Having, as I myself believe, construed the only possible ambiguities of the paragraph in the only way reasonably possible, the remainder, commanding the General Assembly to elect a Governor under the contingency stated, is as plain as language can make it, and is as plain now as it was in 1824. As it seems to me, the attack on the action taken by the General Assembly seems based, not so much on the theory that the Constitution fails to say what it means, as on the supposition that it does not mean what it says.

But it is insisted that the legislature, by the now obsolete Code, § 40-102, has itself construed this paragraph of the Constitution, as it was contained in the old Constitution prior to its being carried forward to the present Constitution. The argument is that the people when carrying it forward into the present Constitution must have had in mind the interpretation previously made by the legislature. It is urged that this Code section shows that the legislature had construed the paragraph of the Constitution to mean that it did not have power to elect a Governor except when at the General Election no person did then receive a majority. It will be seen that the legislature by this Code section was not dealing at all with the *General Election* dealt with by the paragraph of the Constitution, but was providing for a Special Election for Governor on account of a vacancy occurring in the office of Governor before the office of Lieutenant Governor had been created. This Special Election was under its own control, and it was privileged to depart from what the Constitution provided with respect to a failure under the General Election in any way it saw fit. Referring to this Special Election provided for by itself, the General Assembly declares that it shall elect when no person "shall receive a majority . . at such Special Election, as provided in the Constitution." It is manifest that it did not cover the whole ground even as to such Special Election, as was done by the general language in the provision of the Constitution relating to the General Election. The language of the statute was apt enough as dealing with living persons who were concerned in the Special Election, but its language does not cover and does not take into account, as the Constitution does, the possibility of the successful candidate dying prior to taking office. So far as the statutory reference to the

Constitution is concerned, it manifestly refers to the *manner and method* to be employed by the General Assembly when electing a Governor where such a Special Election shall fail. This reference is the means and the only means by which provision was made as to the method of procedure to be followed by the General Assembly. It would seem to be a strained construction to seek to make it apply as an interpretation as to *other* matters which the General Assembly evidently did not have in mind. It would therefore seem a slender thread indeed to hang an argument on, that the people in ratifying the present Constitution had this provision in mind as amounting in some sort of way to a vague and indefinite interpretation of the constitutional provision now under review.

■ *The right and duty of the General Assembly to adjudge when an election by the people has failed not only being in the General Assembly under the facts here existing, but that body having not only adjudged but correctly adjudged that such election had failed in this case, it follows that under such circumstances it was its duty to elect a Governor. Therefore it is wholly unnecessary for us to speculate as to what the law would have been had the General Assembly sought to elect some person other than one of the two "persons" in life whom it had adjudicated had received the highest number of votes and who would not decline to serve. This is true for two reasons: first, because under the facts presented the question is purely academic and is not presented by the record, since the General Assembly after publishing the returns and declaring that the election had failed, then proceeded to follow the exact language written into the Constitution; and second, because the execution of its power, if it had the power, and I have sought to show that it did, was a purely political function concerning which courts are not privileged to interfere.*

I am unable to agree that a delegated political function ceases to be such even if in its *exercise* the legislative branch of Government should find it necessary to construe the Constitution. The General Assembly and the executive branch of government are given all political authority not actually inconsistent with the Constitution. The General Assembly no less than courts must support the Constitution of the people; but the people have entrusted to it and not the courts the duty of keeping itself within bounds in the administration of its actual political duties and powers. In this case

not only did the General Assembly, in the performance of what I have sought to show was its political authority, keep within the exact letter of the Constitution, but since courts have no authority to intervene in the execution of an actual political authority, it would be fruitless for them to even speculate as to whether, under the special circumstances of this case, it would have correctly performed its political duties had it sought to do otherwise.

From all that has been said in this dissenting opinion, it will be seen: (a) Mr. Thompson could not possibly claim, nor does he in fact seek to claim office by virtue of the death of Hon. Eugene Talmadge, since Mr. Talmadge at the time of his death had not become Governor, nor had Mr. Thompson become Lieutenant Governor. He bases his claim solely by virtue of the resignation in his favor of the incumbent Governor, who when the election became ineffective was entitled by the Constitution to hold over beyond his regular term until, but only until, his successor could be chosen and qualified. Mr. Thompson therefore stands in the shoes of the Governor holding over and could occupy no better position than he under whom he claims. (b) I am convinced that, when the General Assembly comes to canvass the returns of an election for Governor, it is made their duty, under the scheme of the Constitution of *this particular* State at least, to determine whether or not the election has failed. If there be any person having a majority of the votes cast, it is made their duty to declare him "duly elected Governor," and to proceed to "install" him in office. If, on the other hand, there shall be no "person" who shall then "have" a majority vote, whom it can declare "duly elected Governor" and whom it can proceed to install, it seems manifest to me that it should so declare. It is not a mere teller to tabulate the figures. (c) If no "person" shall "have" a majority of the votes cast, whom it can declare Governor-elect and proceed to install in office, it becomes the duty of the General Assembly under the mandate of the Constitution to proceed to elect a Governor in the manner therein prescribed. (d) Under ordinary circumstances, all this, though disputed, seems perfectly plain to me; but under the somewhat ambiguous language of the Constitution *as applied to the facts here presented* it was and is, as I believe, a *justiciable* question, that is, subject to court adjudication as to whether or not the General Assembly was authorized to determine whether the election had or

had not failed; and whether, therefore, it should or should not proceed to elect a Governor under its delegated political authority. (e) The answer to these questions, as in this opinion I have sought to show, is that it does have the right to determine one way or another each of these questions as a part of its delegated political authority. (f) The General Assembly thus having the right as a part of its political authority to determine whether or not under the facts here presented the election had or had not failed for the reason indicated, and it also having in my opinion the right to determine as a part of its political authority the question as to whether under the facts presented it must proceed to elect a Governor (both of these questions as to the right to decide at all being, as stated, justiciable and therefore subject to review by the courts) —it follows just as plainly that in each instance the *exercise* of this authority, if it had the authority, that is, the determination either that the election had failed or that it had not failed, and that the General Assembly must or must not elect a Governor, is not subject to review, the only question open to review being whether it had the right to decide the questions at all. (g) Accordingly, while I differ with my majority colleagues as to whether the General Assembly had political authority to adjudicate those questions at all, for I think that it did, while they by the controlling majority opinion have adjudicated that it did not, I do not differ with them on the proposition that authority to adjudicate must be first had before it can be exercised. My disagreement is that, on this justiciable question as to whether or not the General Assembly had the right and power to determine these questions, it not only had the exclusive political authority to do so, but in the *exercise* of such authority it in fact determined them correctly.

CANDLER, Justice, dissenting. In my view the cases do not present justiciable controversies. It is my opinion that they involve questions over which the General Assembly has been given exclusive jurisdiction, and whether it has acted correctly or incorrectly, the courts are given no power under the Constitution to interfere.